## UNITED STATES v. THE DELVALLE.

### No. 508.

District Court, E. D. Louisiana, New Orleans Division.

June 24, 1942.

Herbert W. Christenberry, U. S. Atty., and N. E. Simoneaux, Asst. U. S. Atty., both of New Orleans, La., for plaintiff.

Terriberry, Young, Rault & Carroll, and Benjamin W. Yancey, all of New Orleans, La., for defendant.

BORAH, District Judge.

This is a proceeding in rem to charge the steamship Delvalle with a fine for discharging fuel oil into the waters of the Mississippi River at New Orleans, Louisiana. It is brought pursuant to the provisions of 33 U.S.C.A. §§ 407, 411 and 412.

Section 407, 33 U.S.C.A., makes it unlawful "to throw, discharge, or deposit, or cause, suffer, or procure to be thrown, discharged, or deposited either from or out of any ship, barge, or other floating craft of any kind, * * * any refuse matter of any kind or description whatever * * * into any navigable water of the United States * * *." It is further provided, 33 U.S.C.A. § 411, that any person or corporation who violates the above statute is guilty of a misdemeanor or punishable by fine or imprisonment or both, and the same enactment, 33 U.S.C.A. § 412, makes liable any boat, vessel, scow, raft, or other craft used or employed in violating any of the provisions of the statute set forth above.

It has been stipulated and agreed that the facts which give rise to this proceeding are as follows:

On March 21 and 22, 1941, the American steamship Delvalle was moored in the Mississippi River at the Poydras Street wharf, within the harbor limits of the port of New Orleans, in the navigable waters of the United States. At about 3:40 a. m. of March 22, 1941, it was discovered by the officers of the Delvalle that fuel oil was leaking from the overboard discharge pipe

of the starboard settling tank. The fuel oil which was so leaking and falling by its own weight and the force of gravity fell into the navigable waters of the United States, the Mississippi River at New Orleans.

In accordance with usual, approved, proper, and seaworthy construction, the steamship Delvalle has two large settling tanks, one on the starboard and the other on the port side, just forward of the fire room. The purpose of these tanks is to allow the fuel oil used by the oil system of the vessel to stand and settle prior to use in the fires. From each of these settling tanks leads a line or pipe, these pipes joining in the main fuel line or pipe leading to the boilers of the vessel. From this main pipe or fuel line another pipe or line separates and runs upward from the fire room to the galley, where it furnishes oil to the galley fuel tank. This subsidiary line is controlled by two valves, one a master valve in the engine room which is for use only in emergencies and is accordingly always left open, and the other a valve in the galley. The purpose of the galley fuel tank is for storage of fuel for the galley cooking stoves or ranges, and from this galley fuel tank a pipe or line leads to the burners of the said cooking stoves or ranges. Also, from the said galley fuel tank another pipe or line leads back down from the galley to the starboard settling tank, the purpose of this pipe or line being to take care of any overflow from the galley fuel tank, the oil entering this line flowing by its own weight and by the force of gravity back down to the starboard settling tank. At the top of the starboard settling tank there is an overboard discharge pipe leading through the skin to the ship, the only purpose of said overboard discharge pipe being to prevent any accidental overflow of the starboard settling tank.

During the working day of March 21, 1941, fires on the main boilers of the steamship Delvalle had been fueled from the starboard settling tank. At about 5 p. m. of that day the engine room and fire room officers of the Delvalle switched to the port settling tank from which oil continued to be pumped through the main fuel line to the fires of the main boilers.

At about 3:40 a. m. March 22nd the fireman on watch in the fire room of the Delvalle discovered seepage through the sounding pipe of the starboard settling tank, which indicated that that tank was over-flowing. Investigation immediately disclosed that the galley valve in the line to the galley fuel storage tank had not been tightly closed but was "cracked" just off its seat.

It is not known who had left this galley valve slightly open. The galley valve was not entirely open but was only slightly open, indicating that it had been closed but not completely closed. The keeping of this valve closed is and was the duty of the galley employees, who are to open the valve whenever some fuel is needed in the galley fuel tank and to close it immediately after the galley fuel tank has been properly filled.

This galley valve being not properly and completely closed, as fuel oil was pumped to the fires of the main boilers from the port settling tank, certain of the oil was diverted into the galley fuel storage tank, which tank slowly and gradually filled up, slowly and gradually overflowing through the overflow line back into the starboard settling tank, so that, as the galley fuel storage tank overflowed, because of the seepage through the incompletely closed valve, such overflow went, by its own weight and by the force of gravity, into the starboard settling tank. This process continued until the settling tank was full enough, so that the oil reached the overboard discharge pipe and fell through this opening into the Mississippi River.

The fuel oil which found its way in the manner set forth above into the navigable waters of the United States was completely sound, valuable, and usable material, in no way damaged or impaired in value. There was no intention on the part of the claimant or its employees to reject, refuse, or discard the oil which found its way overboard, but the leakage occurred in the manner set forth above entirely without the intent or knowledge of the claimant or its employees. At no time did the claimant or any of its employees have any knowledge that the occurrence was taking place until the leakage had already been going on for some unknown time. Neither the claimant nor its employees had any intent to throw, discharge, or deposit any oil in the river.

The exact amount of oil which escaped or found its way from the Delvalle into the Mississippi River in the manner set forth above is unknown, but it exceeded five barrels in quantity.

### Findings of Fact.

The Court finds the facts to be in accordance with the above stipulation of counsel.

## Conclusions of Law.

■ 1. The statute in suit is a penal statute and must be strictly construed.

■ 2. The word "refuse" is used in the statute in its adjective sense. Webster's New International Dictionary, 2nd Edition, Unabridged, defines the adjective, "refuse," as follows: "Refused; rejected; thrown aside or left as worthless or of no value; worthless; useless."

■ 3. The oil involved in this proceeding was not refused, rejected, or thrown aside or left as worthless or of no value. It was not worthless nor useless. The accidental dicharge of valuable, usable oil, under the circumstances set forth, does not constitute a throwing, discharging, or depositing of refuse matter, and is not a violation of the statute. 33 U.S.C.A. §§ 407, 411 and 412.

4. The libel should be dismissed.

Let a decree be entered accordingly.