## UNITED STATES *v.* STANDARD OIL CO.

No. 291.   Argued January 25, 1966.—Decided May 23, 1966.

*Nathan Lewin* argued the cause for the United States.   With him on the brief were *Solicitor General Marshall, Assistant Attorney General Vinson* and *Beatrice Rosenberg.*

*Earl B. Hadlow* argued the cause and filed a brief for appellee.

MR. JUSTICE DOUGLAS delivered the opinion of the Court.

The question presented for decision is whether the statutory ban on depositing "any refuse matter of any

kind or description"[1] in a navigable water covers the discharge of commercially valuable aviation gasoline.

Section 13 of the Rivers and Harbors Act provides:

> "It shall not be lawful to throw, discharge, or deposit . . . any refuse matter of any kind or description whatever other than that flowing from streets and sewers and passing therefrom in a liquid state, into any navigable water of the United States . . . ." 33 U. S. C. § 407 (1964 ed.).

The indictment charged appellee, Standard Oil (Kentucky), with violating § 13 by allowing to be discharged into the St. Johns River "refuse matter" consisting of 100-octane aviation gasoline. Appellee moved to dismiss the indictment, and, for the purposes of the motion, the parties entered into a stipulation of fact. It states that the gasoline was commercially valuable and that it was discharged into the St. Johns only because a shut-off valve at dockside had been "accidentally" left open.

The District Court dismissed the indictment because it was of the view that the statutory phrase "refuse matter" does not include commercially valuable oil. The United States appealed directly to this Court under the Criminal Appeals Act (18 U. S. C. § 3731 (1964 ed.)). We noted probable jurisdiction. 382 U. S. 807.

This case comes to us at a time in the Nation's history when there is greater concern than ever over pollution—one of the main threats to our free-flowing rivers and to our lakes as well. The crisis that we face in this respect would not, of course, warrant us in manufacturing offenses where Congress has not acted nor in stretching statutory language in a criminal field to meet strange conditions. But whatever may be said of the rule of strict construction, it cannot provide a substitute for common sense, precedent, and legislative history. We

---

[1] 30 Stat. 1152, 33 U. S. C. § 407 (1964 ed.).

cannot construe § 13 of the Rivers and Harbors Act in a vacuum. Nor can we read it as Baron Parke [2] would read a pleading.

The statutory words are "any refuse matter of any kind or description." We said in *United States* v. *Republic Steel Corp.*, 362 U. S. 482, 491, that the history of this provision and of related legislation dealing with our free-flowing rivers "forbids a narrow, cramped reading" of § 13. The District Court recognized that if this were waste oil it would be "refuse matter" within the meaning of § 13 but concluded that it was not within the statute because it was "valuable" oil.[3] That is "a narrow, cramped reading" of § 13 in partial defeat of its purpose.

Oil is oil and whether useable or not by industrial standards it has the same deleterious effect on waterways. In either case, its presence in our rivers and harbors is both a menace to navigation and a pollutant. This seems to be the administrative construction of § 13, the Solicitor General advising us that it is the basis of prosecution in approximately one-third of the oil pollution cases reported to the Department of Justice by the Office of the Chief of Engineers.

Section 13 codified pre-existing statutes:

An 1886 Act (24 Stat. 329) made it unlawful to empty "any ballast, stone, slate, gravel, earth, slack, rubbish, wreck, filth, slabs, edgings, sawdust, slag, or cinders, or other refuse or mill-waste of any kind into New York

---

[2] A man whose "fault was an almost superstitious reverence for the dark technicalities of special pleading." XV Dictionary of National Biography, p. 226 (Stephen and Lee ed. 1937–1938).

[3] The District Court followed the decision of the United States District Court in *United States* v. *The Delvalle*, 45 F. Supp. 746, 748, where it was said: "The accidental discharge of *valuable, usable oil* . . . does not constitute . . . a violation of the statute." (Emphasis added.)

Harbor"—which plainly includes valuable pre-discharge material.

An 1888 Act (25 Stat. 209) "to prevent obstructive and injurious deposits" within the Harbor of New York and adjacent waters banned the discharge of "refuse, dirt, ashes, cinders, mud, sand, dredgings, sludge, acid, *or any other matter of any kind,* other than that flowing from streets, sewers, and passing therefrom in a liquid state"—which also plainly includes valuable pre-discharge material. (Emphasis added.)

The 1890 Act (26 Stat. 453) made unlawful emptying into navigable waters "any ballast, stone, slate, gravel, earth, rubbish, wreck, filth, slabs, edgings, sawdust, slag, cinders, ashes, refuse, or other waste of any kind . . . which shall tend to impede or obstruct navigation." Here also valuable pre-discharge materials were included.

The 1894 Act (28 Stat. 363) prohibited deposits in harbors and rivers for which Congress had appropriated money for improvements, of "ballast, refuse, dirt, ashes, cinders, mud, sand, dredgings, sludge, acid, *or any other matter of any kind* other than that flowing from streets, sewers, and passing therefrom in a liquid state." (Emphasis added.) This Act also included valuable pre-discharge material.

The Acts of 1886 and 1888, then, dealt specifically with the New York Harbor; the scope of the latter was considerably broader, covering as it did the deposit of "any other matter of any kind." The Acts of 1890 and 1894 paralleled the earlier enactments pertaining to New York, applying their terms to waterways throughout the Nation.

The 1899 Act now before us was no more than an attempt to consolidate these prior Acts into one. It was indeed stated by the sponsor in the Senate to be "in accord with the statutes now in existence, only scattered . . . from the beginning of the statutes down

through to the end" (32 Cong. Rec. 2296), and reflecting merely "[v]ery slight changes to remove ambiguities." *Id.*, p. 2297.

From an examination of these statutes, several points are clear. *First,* the 1894 Act and its antecedent, the 1888 Act applicable to the New York Harbor,[4] drew on their face no distinction between valuable and valueless substances. *Second,* of the enumerated substances, some may well have had commercial or industrial value prior to discharge into the covered waterways. To be more specific, ashes and acids were banned whether or not they had any remaining commercial or industrial value. *Third,* these Acts applied not only to the enumerated substances but also to the discharge of "any other matter of any kind." Since the enumerated substances included those with a pre-discharge value, the rule of *ejusdem generis* does not require limiting this latter category to substances lacking a pre-discharge value. *Fourth,* the coverage of these Acts was not diminished by the codification of 1899. The use of the term "refuse" in the codification serves in the place of the lengthy list of enumerated substances found in the earlier Acts and the catch-all provision found in the Act of 1890. The legislative history demonstrates without contradiction that Congress intended to codify without substantive change the earlier Acts.

The philosophy of those antecedent laws seems to us to be clearly embodied in the present law. It is plain from its legislative history that the "serious injury" to our watercourses (S. Rep. No. 224, 50th Cong., 1st Sess.,

---

[4] The codification did not include the Acts of 1886 and 1888 which pertained only to New York. These remain in effect and are found at 33 U. S. C. §§ 441–451 (1964 ed.). The New York Harbor statute has been held to apply not only to waste oil which was unintentionally discharged (*The Albania,* 30 F. 2d 727) but also to valuable oil negligently discharged. *The Colombo,* 42 F. 2d 211.

p. 2) sought to be remedied was caused in part by obstacles that impeded navigation and in part by pollution—"the discharge of sawmill waste into streams" (*ibid.*) and the injury of channels by "deposits of ballast, steam-boat ashes, oysters, and rubbish from passing vessels." *Ibid.* The list is obviously not an exhaustive list of pollutants. The words of the Act are broad and inclusive: "any refuse matter of any kind or description whatever." Only one exception is stated: "other than that flowing from streets and sewers and passing therefrom in a liquid state, into any navigable water of the United States." More comprehensive language would be difficult to select. The word "refuse" does not stand alone; the "refuse" banned is "of any kind or description whatever," apart from the one exception noted. And, for the reasons already stated, the meaning we must give the term "refuse" must reflect the present codification's statutory antecedents.

The Court of Appeals for the Second Circuit in *United States* v. *Ballard Oil Co.*, 195 F. 2d 369 (L. Hand, Augustus Hand, and Harrie Chase, JJ.) held that causing good oil to spill into a watercourse violated § 13. The word "refuse" in that setting, said the court, "is satisfied by anything which has become waste, however useful it may earlier have been." [5] *Id.*, p. 371. There is nothing

---

[5] The decisions in the instant case below and in *United States* v. *The Delvalle, supra*, n. 3, are against the stream of authority. An unreported decision of a United States District Court in 1922 (*United States* v. *Crouch*), holding § 13 inapplicable to polluting but nonobstructing deposits, caused the Oil Pollution Act, 1924, 43 Stat. 604, 33 U. S. C. § 431 *et seq.* (1964 ed.), to be passed. See S. Rep. No. 66, 68th Cong., 1st Sess.; H. R. Rep. No. 794, 68th Cong., 1st Sess. It is applicable to the discharge of oil by vessels into coastal waters but not to deposits into inland navigable waters; and it explicitly provides that it does not repeal or modify or in any manner affect other existing laws. 33 U. S. C. § 437 (1964 ed.).

more deserving of the label "refuse" than oil spilled into a river.

That seems to us to be the common sense of the matter. The word "refuse" includes all foreign substances and pollutants apart from those "flowing from streets and sewers and passing therefrom in a liquid state" into the watercourse.

That reading of § 13 is in keeping with the teaching of Mr. Justice Holmes that a "river is more than an amenity, it is a treasure." *New Jersey* v. *New York*, 283 U. S. 336, 342. It reads § 13 charitably as *United States* v. *Republic Steel Corp., supra,* admonished.

We pass only on the quality of the pollutant, not on the quantity of proof necessary to support a conviction nor on the question as to what *scienter* requirement the Act imposes, as those questions are not before us in this restricted appeal.[6]                    *Reversed.*

MR. JUSTICE HARLAN, whom MR. JUSTICE BLACK and MR. JUSTICE STEWART join, dissenting.

Had the majority in judging this case been content to confine itself to applying relevant rules of law and to leave policies affecting the proper conservation of the Nation's rivers to be dealt with by the Congress, I think that today's decision in this criminal case would have eventuated differently. The best that can be said for the Government's case is that the reach of the provision of

---

[6] "Having dealt with the construction placed by the court below upon the Sherman Act, our jurisdiction on this appeal is exhausted. We are not at liberty to consider other objections to the indictment or questions which may arise upon the trial with respect to the merits of the charge. For it is well settled that where the District Court has based its decision on a particular construction of the underlying statute, the review here under the Criminal Appeals Act is confined to the question of the propriety of that construction." *United States* v. *Borden Co.,* 308 U. S. 188, 206–207.

§ 13 of the Rivers and Harbors Act of 1899, 30 Stat. 1152, 33 U. S. C. § 407 (1964 ed.), under which this indictment is laid, is uncertain. This calls into play the traditional rule that penal statutes are to be strictly construed. In my opinion application of that rule requires a dismissal of the indictment.

## I.

Section 13 forbids the deposit of all kinds of "refuse matter" into navigable rivers "other than that flowing from streets and sewers and passing therefrom in a liquid state." As the Court notes, this 1899 Act was part of a codification of prior statutes. This revamping was not discussed at any length on the floor of either House of Congress; the Senate was informed only that the provisions were merely a codification of existing law, without changes in substance. 32 Cong. Rec. 2296–2297 (1899). Section 13 was in fact based on two very similar prior statutes. The rivers and harbors appropriation act of 1890 provided the first national anti-obstruction provision, 26 Stat. 453:

"Sec. 6. That it shall not be lawful to cast, throw, empty, or unlade, or cause, suffer, or procure to be cast, thrown, emptied, or unladen, either from or out of any ship, vessel, lighter, barge, boat, or other craft, or from the shore, pier, wharf, furnace, manufacturing establishments, or mills of any kind whatever, any ballast, stone, slate, gravel, earth, rubbish, wreck, filth, slabs, edgings, sawdust, slag, cinders, ashes, refuse, or other waste of any kind, into any port, road, roadstead, harbor, haven, navigable river, or navigable waters of the United States which shall tend to impede or obstruct navigation . . . ."

A later statute, § 6 of the Rivers and Harbors Act of 1894, 28 Stat. 363, provided somewhat similarly:

"That it shall not be lawful to place, discharge, or deposit, by any process or in any manner, ballast,

refuse, dirt, ashes, cinders, mud, sand, dredgings, sludge, acid, or any other matter of any kind other than that flowing from streets, sewers, and passing therefrom in a liquid state, in the waters of any harbor or river of the United States, for the improvement of which money has been appropriated by Congress . . . ."

The Court relies primarily on the latter Act, contending that its applicability to "any other matter of any kind" would surely encompass oil, even though commercially valuable. Further, the Court notes (*ante,* p. 228) that the 1894 statute was modeled after a federal statute of 1888 dealing with New York Harbor, 25 Stat. 209. Under this New York Harbor Act, which still remains on the books, 33 U. S. C. § 441 *et seq.* (1964 ed.), prosecutions for accidental deposits of commercially useful oil have been sustained. *The Colombo,* 42 F. 2d 211. This background is thought to reinforce the view that oil of any type would fall within the 1894 statute's purview. Since the present enactment was intended to be merely a codification, the majority concludes that the construction of the broader 1894 predecessor should govern.

Whatever might be said about how properly to interpret the 1890 and, more especially, the 1894 statutes, it is the 1899 Act that has been on the books for the last 67 years, and its purposes and language must guide the determination of this case. To the extent that there were some differences in scope between the 1890 and 1894 Acts, these were necessarily resolved in the 1899 codification, which, while embodying the essential thrust of both prior statutes, appears from its plain language to have favored the more restrictive coverage of the 1890 Act. Moreover, it is questionable to what extent the Court's speculation as to the meaning of a phrase in one of the prior statutes is relevant at all when the language of the pres-

ent statute, which is penal in nature, is in itself explicit and unambiguous.

The purpose of § 13 was essentially to eliminate obstructions to navigation and interference with public works projects. This 1899 enactment, like the two pre-existing statutes which it was intended to codify, was a minor section attached to a major appropriation act together with other measures dealing with sunken wrecks,[1] trespassing at public works sites,[2] and obstructions caused by improperly constructed bridges, piers, and other structures.[3] These statutes were rendered necessary primarily because navigable rivers, which the Congress was appropriating funds to improve, were being obstructed by depositing of waste materials by factories and ships.[4] It is of course true, as the Court observes, that "oil is oil," *ante,* p. 226, and that the accidental spillage of valuable oil may have substantially the same "deleterious effect on waterways" as the wholesale depositing of waste oil. But the relevant inquiry is not the admittedly important concerns of pollution control, but Congress' purpose in enacting this anti-obstruction Act, and that appears

---

[1] Rivers and Harbors Act of 1899, § 15, 30 Stat. 1152, 33 U. S. C. § 409 (1964 ed.).

[2] Rivers and Harbors Act of 1899, § 14, 30 Stat. 1152, 33 U. S. C. § 408 (1964 ed.).

[3] Rivers and Harbors Act of 1899, § 12, 30 Stat. 1151, 33 U. S. C. § 406 (1964 ed.).

[4] Congress was presented, when considering one of the predecessors of the 1899 Act, with the representations of the Office of the Chief of Army Engineers that there had been "serious injury to navigable waters by the discharge of sawmill waste into streams . . . . In fair-ways of harbors, channels are injured from deposits of ballast, steam-boat ashes, oysters, and rubbish from passing vessels." S. Rep. No. 224, 50th Cong., 1st Sess., 2 (1888). See also H. R. Rep. No. 1826, 55th Cong., 3d Sess., 3–4 (1899). There is no support for the proposition that these statutes were directed at "pollution" independently of "obstruction."

quite plainly to be a desire to halt through the imposition of criminal penalties the depositing of obstructing refuse matter in rivers and harbors.

The Court's construction eschews the everyday meaning of "refuse matter"—waste, rubbish, trash, debris, garbage, see Webster's New International Dictionary, 3d ed.—and adopts instead an approach that either reads "refuse" out of the Act altogether, or gives to it a tortured meaning. The Court declares, at one point, that "The word 'refuse' includes all foreign substances and pollutants apart from those 'flowing from streets and sewers and passing therefrom in a liquid state' into the watercourse." *Ante,* p. 230. Thus, dropping anything but pure water into a river would appear to be a federal misdemeanor. At the same time, the Court also appears to endorse the Second Circuit's somewhat narrower view that "refuse matter" refers to any material, however valuable, which becomes unsalvageable when introduced into the water. *Ante,* pp. 229–230. On this latter approach, the imposition of criminal penalties would in effect depend in each instance on a prospective estimate of salvage costs. Such strained definitions of a phrase that is clear as a matter of ordinary English hardly commend themselves, and at the very least raise serious doubts as to the intended reach of § 13.

## II.

Given these doubts as to the proper construction of "refuse matter" in § 13, we must reckon with a traditional canon that a penal statute will be narrowly construed. See II Hale, Historia Placitorum Coronae 335 (1736); *United States* v. *Wiltberger,* 5 Wheat. 76, 95. The reasons underlying this maxim are various. It appears likely that the rule was originally adopted in order to spare people from the effects of exceedingly harsh penalties. See Hall, Strict or Liberal Construction of Penal

Statutes, 48 Harv. L. Rev. 748, 750 (1935). Even though this rationale might be thought to have force were the defendant a natural person,[5] I cannot say that it is particularly compelling in this instance where the maximum penalty to which Standard Oil might be subject is a fine of $2,500. 33 U. S. C. § 411 (1964 ed.).

A more important contemporary purpose of the notion of strict construction is to give notice of what the law is, in order to guide people in their everyday activities. Again, however, it is difficult to justify a narrow reading of § 13 on this basis. The spilling of oil of any type into rivers is not something one would be likely to do whether or not it is legally proscribed by a federal statute. A broad construction would hardly raise dangers of penalizing people who have been innocently pouring valuable oil into navigable waters, for such conduct in Florida is unlawful whatever the effect of § 13. A Florida statute penalizing as a misdemeanor the depositing into waters within the State of "any rubbish, filth, or poisonous or deleterious substance or substances, liable to affect the health of persons, fish, or live stock . . . ," Fla. Stat. Ann., § 387.08 (1960 ed.), quite evidently reaches the dumping of commercial oil. And Florida's nuisance law would likewise seem to make this conduct actionable in equity. See, e. g., The Ferry Pass Inspectors' & Shippers' Assn. v. The Whites River Inspectors' & Shippers' Assn., 57 Fla. 399, 48 So. 643. Finally, as noted earlier, ante, p. 229, n. 5, prior decisions by some lower courts have held § 13 applicable to spillage of oil. For these reasons this justification for the canon of strict construction is not persuasive in this instance.

---

[5] The minimum sentence for an individual convicted of violating § 13 is a $500 fine or 30 days' imprisonment, not an insignificant penalty for accidentally dropping foreign matter into a river. 33 U. S. C. § 411 (1964 ed.).

There is, however, a further reason for applying a seemingly straightforward statute in a straightforward way. In *McBoyle* v. *United States,* 283 U. S. 25, this Court held that a statute making it a federal crime to move a stolen "motor vehicle" in interstate commerce did not apply to a stolen airplane. That too was a case in which precise clarity was not required in order to give due warning of the line between permissible and wrongful conduct, for there could not have been any question but that stealing aircraft was unlawful. Nevertheless, Mr. Justice Holmes declared that "Although it is not likely that a criminal will carefully consider the text of the law before he murders or steals, it is reasonable that a fair warning should be given to the world in language that the common world will understand, of what the law intends to do if a certain line is passed." 283 U. S., at 27. The policy thus expressed is based primarily on a notion of fair play: in a civilized state the least that can be expected of government is that it express its rules in language all can reasonably be expected to understand. Moreover, this requirement of clear expression is essential in a practical sense to confine the discretion of prosecuting authorities, particularly important under a statute such as § 13 which imposes criminal penalties with a minimal, if any, *scienter* requirement.[6]

In an area in which state or local law has traditionally regulated primary activity,[7] there is good reason to re-

___

[6] The parties were not in agreement as to what *scienter* requirement the statute imposes. This question is not before us under the restricted jurisdiction granted to this Court under 18 U. S. C. § 3731 (1964 ed.), see *United States* v. *Petrillo,* 332 U. S. 1; *United States* v. *Borden Co.,* 308 U. S. 188, and the Court today intimates no views on the question.

[7] Besides the Florida pollution statute adverted to earlier, Fla. Stat. Ann., § 387.08 (1960 ed.), the ·city of Jacksonville has enacted ordinances dealing generally with fire prevention, Jacksonville Ordi-

strict federal penal legislation within the confines of its language. If the Federal Government finds that there is sufficient obstruction or pollution of navigable waters caused by the introduction of commercial oil or other nonrefuse material, it is an easy matter to enact appropriate regulatory or penal legislation.[8] Such legislation can be directed at specific types of pollution, and the remedies devised carefully to ensure compliance. Indeed, such a statute was enacted in 1924 to deal with oil pollution in coastal waters caused by vessels, 43 Stat. 605, 33 U. S. C. §§ 433, 434 (1964 ed.).

To conclude that this attempted prosecution cannot stand is not to be oblivious to the importance of preserving the beauties and utility of the country's rivers. It is simply to take the statute as we find it. I would affirm the judgment of the District Court.

---

nance Code §§ 19–4.1 to 19–4.24 (1958 Supp.), disposal of waste material, § 21–12 (1958 Supp.), and pollution of the city water supply, § 27–52 (1953 Code).

[8] See, e. g., special message of the President dealing with new anti-pollution legislation, Preservation of Our Natural Heritage—Message from the President of the United States, H. Doc. No. 387, 89th Cong., 2d Sess., Cong. Rec., Feb. 23, 1966, pp. 3519–3522.