**Commonwealth v. Wyeth Laboratories**

*Hershel J. Richman,* for Commonwealth.
*Richard E. McDevitt,* for defendant.

## ADJUDICATION

KURTZ, P. J., February 10, 1972.—The Commonwealth here seeks a mandatory injunction requiring defendant to abate a public nuisance. Its complaint contains two counts. By the first, it invokes the provisions of section 401 of The Clean Streams Law of June 22, 1937, P. L. 1987, as amended, 35 PS §691.401, which proscribes the pollution of "waters of the Commonwealth." By the second, it seeks the same type of relief against the discharge of industrial waste into such waters in violation of the provisions of section 301 of said act: 35 PS §691.301.

After a preliminary injunction was refused (see Commonwealth v. Wyeth Laboratories, 19 Chester 117 (1971)), an answer was filed by defendant and when the matter came on for trial plaintiff abandoned its effort to obtain relief under the second count. We must now decide whether it is entitled to the relief it seeks by reason of the provisions of section 401, cited above, and the proofs submitted in support of count I of the complaint.

The pleadings consist of a complaint and an answer. The issues are these: First, is defendant permitting the pollution of "waters of the Commonwealth" in violation of the provisions of section 401; and, second, may the relief here sought be granted? In addition, defendant challenges the constitutionality of the statute as its provisions are here sought to be applied. Although we do not consider this to be one of the principal issues of the case, we will give it consideration in the discussion to follow.

## FINDINGS OF FACT

1. Defendant (hereinafter called Wyeth) is the own-

er of some 40 acres of land situate in the southeastern part of the Borough of West Chester in this county, title to which was acquired in 1948 or 1949. It is bounded on the east by Bolmar Street, on the south by Nields Street, on the west by Adams Street, and on the north by Union Street.

2. The land was low-lying as originally acquired, sloping generally from the north to south. It was not then occupied or put to any particular use. Parts of it were swampy and marshy. Some years prior to its acquisition by Wyeth, it had been used as the borough dump where solid refuse, exclusive of garbage, had been disposed of over a period of time. In addition, a company engaged in the production of fire extinguishing materials had used it as a dumping ground for waste gypsum and other chemicals used in that production. It was underlaid with a layer of clay, the presence of which had adapted it to use as a brick yard some years ago. The pits created by the digging of clay to be made into bricks were used as receptacles for the rubbish and trash which was thereafter dumped upon it. The water table under the tract is close to the surface and under pressure to the degree that water will spurt from the ground when a pick is sunk into it on the surface.

3. At the time of its acquisition by Wyeth, two small streams, one of which entered the property from the east and the other from the north, joined upon the property and then flowed as one to the south, leaving the land at its southern boundary on Nields Street.

4. Beginning in 1950 and continuing for some years thereafter, Wyeth constructed a chemical and drug production plant on its property at considerable expense. In that construction it caused great quantities of fill to be placed in the swampy areas so that buildings and other above-ground structures could be built

in those locations. The area which was once a dump has now been covered and buried beneath that fill upon which some buildings and other structures have been placed. Water lying close to the surface was encountered. Pumps were employed to overcome that hazard in the construction operation. Wyeth's operations now occupy the entire tract. It would be extremely difficult for it to rearrange its method of use of the property in view of the permanency of its installation.

5. In 1956, at the instigation of the Borough of West Chester, the main line of the stream was enclosed in 48-inch concrete reinforced pipe, the joints of which were sealed with cement. Thereafter, the two smaller streams which entered the property from the north and east were similarly enclosed. As a result, the streams no longer flowed as open streams upon the surface but were conducted underground from their two points of entry to the point of discharge at Nields Street. The stream then continues to the south and east eventually entering a larger one known as Goose Creek, which flows into Chester Creek, and eventually the Delaware River at the City of Chester in Delaware County.

6. The volume of flow in these streams is not normally great. Measurements thereof made between early September 1970, and January 15, 1971, on the tributary flowing from the east indicated a volume of .7 gallons per minute as a low, and 50 gallons per minute as a high. During the same period, the range of flow on the other branch was from a low of 2.2 gallons per minute to a high of 34.2 gallons. At the point where the consolidated flow leaves the property at its southern boundary, like measurements indicated a low volume of flow of 4.9 gallons per minute and a high of 200 gallons.

7. Extensive testing conducted by the Commonwealth prior to the commencement of this action and thereafter indicated that the quality of the water in the encased streams is altered significantly during its passage across the property. During passage, it acquires a noxious odor, its color is altered and an oily scum becomes evident. Scientifically accepted parameters to determine the existence and extent of pollution indicate that its chemical, biological and physical properties are significantly altered.

8. Subsurface waters percolating through the area of the old dump become contaminated through their contact with such materials as remain from the dumping operation. These waters then seep through the concrete pipe into the streams in question, thereby causing the pollution of which the Commonwealth now complains.

## DISCUSSION

Section 401 of The Clean Streams Law, cited above, provides:

"It shall be unlawful for any person or municipality to put or place into any of the waters of the Commonwealth, *or allow or permit to be discharged from property owned or occupied by such person* or municipality into any of the waters of the Commonwealth, any substance of any kind or character resulting in pollution as herein defined. Any such discharge is hereby declared to be a nuisance." (Italics supplied.)

" 'Waters of the Commonwealth' shall be construed to include any and all rivers, streams, creeks, rivulets, impoundments, ditches, water courses, storm sewers, lakes, dammed water, ponds, springs and all other bodies or channels of conveyance of surface and underground water, or parts thereof, whether natural or artificial, within or on the boundaries of this Commonwealth": 35 PS §691.1.

" 'Pollution' shall be construed to mean contamination of any waters of the Commonwealth such as will create or is likely to create a nuisance or to render such waters harmful, detrimental or injurious to public health, safety or welfare, or to domestic, municipal, commercial, industrial, agricultural, recreational, or other ligitimate beneficial uses, or to livestock, wild animals, birds, fish or other aquatic life, including but not limited to such contamination by alteration of the physical, chemical or biological properties of such waters, or change in temperature, taste, color or odor thereof, or the discharge of any liquid, gaseous, radioactive, solid or other substances into such waters": 35 PS §691.1.

We have little difficulty in concluding that the streams with which we are here concerned constitute "waters of the Commonwealth" within the meaning of the statute, and that they are being polluted in their passage through the Wyeth property by the infiltration of subsurface or percolating waters which have in turn become contaminated in their passage through the old municipal dump. We also believe that Wyeth cannot escape liability for the results of that pollution by asserting that it had no part in the establishment of the dump. In a proper case, a possessor of land may be held liable for damage caused by the maintenance of a public or private nuisance upon his land, despite the fact that it was originally created by a prior owner of the land and thereafter inherited by the present owner through the conveyance of title: Boyer v. Arianna, 94 Pitts. L. J. 21 (1945); Renziehausen v. Borough of West View, 98 Pitts. L. J. 350 (1949); Clarke v. Boysen, 39 F. 2d 800 (10th Cir., 1930); Corby v. Ramsdell, 48 F. 2d 701 (2d Cir., 1931); 66 C. J. S., Nuisances, §88 and cases there cited.

The Restatement 2d, Torts, §366, is to the same ef-

fect. It provides for the imposition of such liability when an unreasonably dangerous artificial condition existing upon land causes such damage under the circumstances therein set forth. Comment b to §363 of that work defines artificial conditions as including excavation or fill which become harmful through the operation of natural forces. The old dump, as the artificial condition existing on Wyeth's land, has become harmful through its contact with the subsurface percolating waters which, in turn, infiltrate the stream.

Neither do we encounter difficulty in holding that no constitutional limitations have been transgressed through the enactment of this statute and its application against defendant. Its enactment finds its basis in the police power of the Commonwealth as it is exercised for the protection of the health, safety and morals of the Commonwealth's citizens. Reasonably applied, its provisions cannot be successfully challenged as exceeding that which is necessary for the protection of those citizens. See U. S. v. Standard Oil Company, 384 U. S. 224, 86 S. Ct. 1427, 16 L. Ed. 492 (1966); and U. S. v. 531.13 Acres of Land, 366 F. 2d 915 (4th Cir., 1966).

The difficult problem which we encounter has to do with the formulation of an appropriate order to correct the situation which we find exists. Although the Commonwealth has suggested one or more possible methods of correction, the record is clear that its representatives who testified were less than definite as to the steps which should be taken to attain that result. For example, one of the witnesses testified concerning a suggestion that a different type of piping be installed through that portion of Wyeth's land where the source of the trouble is thought to be located. He said:

"Here again, saying specifically where it should be done, I feel this should be really a part of an engineer-

ing study. But offering this as *possibly* one approach, that in the area where the pipes were replaced, that is the section where there was infiltration noted, if the pipes were replaced so that the ground water could not infiltrate into the pipe, then at that point just below that area *possibly* by well points or a trench filled with stone with an underdrain to a manhole, that the ground water *could* be intercepted rather than flow further down, *possibly* along the pipe through the ground surface off the property. After interception of the ground water, it would then be pumped—we are suggesting pumping for ultimate treatment—and here again, whether the engineering study would show, to their own existing pretreatment facility with ultimately to the Borough system, this again is one *possibility*."

Again, when asked if Wyeth would be expected to pump all of the ground water found under the property or only that which existed near the dump site, he said:

"Here again, it is *difficult,* but our idea is the contaminated water in the vicinity of the point where it would gain entrance to the sewer if it were not intercepted. Or if we are tightening up the sewer so it would not leave the premises. It is quite *possible* there may be other points to intercept it, *maybe* as it leaves the property." (Italics supplied.)

We cannot draft an order for correction based on such inconclusive testimony. We believe that some plan to overcome the evil should be presented so that the chancellor could either accept or reject it after hearing testimony pro and contra its merits. Anything short of that could be the equivalent of requiring defendant to do something which will not correct the problem, or compelling it to embark upon a long and expensive program of experimentation only to finally discover that the problem is not one for which a reasonable plan of solution can be devised.

Percolating waters follow no particular course. Their course of flow is influenced by gravity and other forces of nature. Even if seepage into the pipe is prevented and water in the area of the dump site is collected and treated, the possibility that other outlets for such water not yet discovered would permit contamination to continue to the same extent and with the same effect as if nothing had been done would still remain. If the problem defies solution, Wyeth should not be compelled to pursue a vain undertaking. Cf. McCabe v. Watt (No. 1), 224 Pa. 253 (1909).

The Supreme Court was faced with a comparable situation in Hannum v. Gruber, 346 Pa. 417 (1943). It there directed the court below to take further testimony as to "possible means" of treating the nuisance-causing emissions from the defendant's plant. It also made mention of the possibility of appointing three persons as experts to visit the premises and report to the court as to corrective steps which might be taken.

We would prefer to adopt the method of appointing experts for that purpose but are reluctant to do so because of practical considerations concerning the payment of their fees. Such fees could properly be assessed as costs if the defendant is eventually directed to put a plan devised in this fashion into operation. However, if no feasible plan is thus produced, Wyeth should not be made to pay those expenses. The liability of the Commonwealth for such costs is questionable at best. In order to meet the practicalities of the situation, we will postpone the imposition of a corrective order at this time so as to enable the parties to submit plans for abatement if they elect to do so. Sixty days, or such additional time as the chancellor may allow for cause shown, will be permitted for that purpose. Each of the parties may submit one or more plans together with estimates as to original costs of construction, costs of

operation, and the time required for implementation. Such plans shall be submitted to the court in writing and a copy thereof served upon the adverse party. Thereafter, a hearing will be scheduled for the purpose of presenting testimony upon the merits of the plans thus submitted. If no such plans are submitted, the complaint will be dismissed.

## CONCLUSIONS OF LAW

1. The Commonwealth is entitled to a mandatory injunction requiring defendant to take such steps as are reasonably necessary to abate a public nuisance existing upon its land situate in the Borough of West Chester in this county, consisting of the pollution of an unnamed stream which flows through its property and eventually into Goose Creek.

2. Jurisdiction of this case will be retained so that plans for the abatement of said nuisance may be developed in accordance with the provisions of a decree to be entered.

## DECREE NISI

And now, February 10, 1972, having considered the pleadings and proofs submitted by the parties to this action, and having heard the arguments of counsel, it is hereby decided and determined that a public nuisance presently exists on lands of defendant, Wyeth Laboratories, a Division of American Home Products Corporation, situate in the Borough of West Chester, in this county, bounded by Union, Bolmar, Nields and Adams Streets, in that waters of the Commonwealth, consisting of a stream or streams flowing through said land are therein becoming polluted as the result of the seepage of underground water into said streams which itself has become contaminated and polluted by its passage through or near an old municipal dump site located therein, all of which is in violation of the pro-

visions of section 401 of the Act of June 22, 1937, P. L. 1987, as amended, 35 PS §691.401, and that defendant is legally responsible for the abatement of said nuisance if abatement thereof can be reasonably accomplished under all the circumstances. Jurisdiction of the case is retained to enable the parties to submit an appropriate plan or plans for the abatement of said nuisance should they desire so to do, and to that end it is directed that such plans be submitted to the court in writing within 60 days of the date of this decree or within such further time as the chancellor for cause shown shall allow, said plans to include estimates as to the costs of installation or construction, the cost of operation, and the time required to put them into effect; a copy thereof to be forthwith served upon the adverse party. If a plan or plans are submitted as provided above, a further hearing will be held at which testimony may be offered and evidence received as to the respective merits thereof including their potential for the production of a proper result. If no such plans are sumitted, the complaint will be dismissed. Costs will abide a final determination.

## OPINION

KURTZ, P. J., October 17, 1972.—The Commonwealth has filed the only exception to the chancellor's adjudication in this case. It is directed to that portion of the decree nisi which permits the parties to submit plans for the abatement of the nuisance which the chancellor has found now exists on defendant's land and directs that if no such plans are submitted the complaint will be dismissed.

By agreement of the parties the disposition of the exception was submitted upon briefs without argument. We have considered the positions thus advanced. We have not been persuaded that our original

decision as it is set forth in the decree nisi should be modified or changed.

The authorities upon which the Commonwealth relies are to be distinguished from the case at bar. In those cases the question for decision was whether a particular activity in which a defendant was presently engaged could be carried on without injury to those who complained through the taking of reasonable precautions or by the expenditure of reasonable amounts of money. In this case defendant is not actively engaged in the process by which the pollution is caused. Here defendant just happens to have bought and occupied the land upon which the pollution-causing condition exists. Nothing which it has done or is doing contributes to the production of the undesirable result. What, if anything, can we now direct it to do to correct that condition?

As the chancellor indicated in his adjudication, to now direct this defendant to submit a plan for abatement without some assurance that a feasible plan is within the realm of possibility is fraught with the risk of requiring it to embark upon a long and unreasonably expensive program of experimentation which may prove to be fruitless. Certainly the complainant should be required to show that there is some reasonable likelihood of success before the defendant is required to take such action. The Commonwealth has failed to present such evidence. As the decree nisi provides, if such a plan is submitted and sustained, appropriate relief will be granted.

This discussion might well dispose of the matter. However, in passing we cannot help but note two recent decisions of the Commonwealth Court which have to do with the ascertainment of the legislative intent expressed in Article III of The Clean Streams Law of June 22, 1937, P. L. 1987, and the amend-

ments thereto up to and including the Act of August 23, 1965, P. L. 372, 35 PS §§691.301, et seq. In those cases it was held that the purpose of that enactment as it was originally adopted was not to force the cleaning of or to prevent further contamination of polluted streams but to protect clean waters from pollution, and that the later amendments prohibited any discharge of industrial waste into the waters of the Commonwealth without a permit. They also hold that waters polluted as the result of mining operations long since discontinued may not be classified as industrial waste within the meaning of the statute. See Pittsburgh Coal Company v. Sanitary Water Board, 4 Comm. Ct. 407 (1972); Harmer Coal Co. v. Sanitary Water Board, 4 Comm. Ct. 435 (1972). Although these cases are not directly on point in this case, they are indicative of the legislative attitude as it bears upon the situation here presented.

Accordingly, the Commonwealth's exception to the decree nisi is dismissed. The decree nisi will become the final decree. It is now entered as of the date of the filing of this opinion.