# United States Court of Appeals
## For the Eighth Circuit

_____

No. 12-2215
_____

Doe Run Resources Corporation

*Plaintiff - Appellant*

v.

Lexington Insurance Company

*Defendant - Appellee*

_____

Appeal from United States District Court
for the Eastern District of Missouri - St. Louis

_____

Submitted: January 16, 2013
Filed: June 13, 2013

_____

Before LOKEN, MURPHY, and COLLOTON, Circuit Judges.

_____

LOKEN, Circuit Judge.

Doe Run Resources Corporation ("Doe Run"), the largest integrated lead producer in the Western Hemisphere, operates the Sweetwater Mine and Mill near Viburnum, Missouri. Doe Run extracts and crushes ore containing lead and other metals at the mine, processes the crushed ore at a mill near the mine, and either sells the resulting lead concentrate on the world market or transports it by truck to Doe Run's smelter for processing into ingots, bars, and other forms. In 2006, Nadist, LLC,

a neighboring landowner, sued Doe Run, alleging environmental property damage resulting from the mine and mill operations (the "Nadist Lawsuit").

More than three years later, Doe Run tendered defense of the Nadist Lawsuit to Lexington Insurance Company ("Lexington") under Commercial General Liability (CGL) policies Doe Run purchased between 1998 and 2006. When Lexington denied coverage on numerous grounds, Doe Run commenced this declaratory judgment action seeking to enforce Lexington's contractual duty to defend Doe Run. The district court[1] granted summary judgment dismissing the complaint, concluding that Lexington had no duty to defend because the policies' absolute pollution exclusions unambiguously bar coverage of all claims asserted in the Nadist Lawsuit. Doe Run appeals. Missouri law governs the issues raised on appeal in this diversity case. Reviewing the district court's grant of summary judgment and interpretation of the policies *de novo*, we affirm. See Royal Ins. Co. of Am. v. Kirksville Coll. of Osteopathic Med., 191 F.3d 959, 961 (8th Cir. 1999) (standard of review).

**I.**

Nadist filed the Nadist Lawsuit in June 2006 and the operative First Amended Complaint in February 2008. In October 2008, the State of Missouri intervened as plaintiff, asserting the same claims for relief under state and federal environmental laws. In September 2009, Doe Run gave Lexington notice of the Nadist Lawsuit and demanded "full defense coverage" under enumerated CGL policies. Those policies imposed two distinct contractual duties, the duty to indemnify Doe Run for covered losses, and the duty to defend Doe Run in a lawsuit seeking damages for losses that may be covered. In this lawsuit, Doe Run seeks only to enforce the duty to defend, which is broader than the duty to indemnify. "The presence of some insured claims

_____

[1]The Honorable Audrey G. Fleissig, United States District Judge for the Eastern District of Missouri.

-2-

in the underlying suit gives rise to a duty to defend, even though uninsured claims or claims beyond the coverage may also be present." Lampert v. State Farm Fire & Cas. Co., 85 S.W.3d 90, 93 (Mo. App. 2002).

Under Missouri law, the duty to defend arises when there is potential liability at the outset of the third party's case. Normally, the duty "is determined by comparing the language of the insurance policy with the allegations in the complaint." McCormack Baron Mgmt. Servs., Inc. v. Am. Guar. Liab. Ins. Co., 989 S.W.2d 168, 170 (Mo. 1999) (citation omitted). "But the insurer may not ignore 'actual facts,' that is, 'facts which were known, or should have been reasonably apparent at the commencement of the [underlying lawsuit].'" Esicorp, Inc. v. Liberty Mut. Ins. Co., 193 F.3d 966, 969 (8th Cir. 1999) (quotation omitted). Here, this standard is more difficult to apply because Doe Run waited three years before tendering defense of the Nadist Lawsuit to Lexington, when Doe Run had already incurred $2,700,000 in defense costs. But as the district court recognized, our focus must still be on the claims asserted in the Nadist Lawsuit's First Amended Complaint. Lexington has no duty to defend if the policies' pollution exclusions barred coverage of all claims asserted in the Nadist Lawsuit. Cas. Indem. Exch. v. City of Sparta, 997 S.W.2d 545, 553 (Mo. App. 1999). Where insurance policy terms unambiguously apply, including coverage exclusions, they will be enforced as written. Krombach v. Mayflower Ins. Co., 827 S.W.2d 208, 210 (Mo. 1992); Auto Club Family Ins. Co. v. Jacobsen, 19 S.W.3d 178, 183 (Mo. App. 2000).

Given this focus of the duty-to-defend inquiry, we will quote at some length from the twenty-six-page First Amended Complaint in the Nadist Lawsuit. The complaint began with general allegations regarding the Doe Run operations at issue:

2. Through its mismanagement of the Mine and Mill, Doe Run has caused hazardous and toxic substances, primarily lead, zinc and lead tailings but also other substances including arsenic, cadmium, chromium,

-3-

copper, manganese, nickel, and thallium to contaminate the soil, air, and water around the Mine and Mill, including property owned by Nadist.

3. According to sampling performed by the Missouri Department of Natural Resources ("MDNR") and Nadist itself, the contamination Doe Run has caused is extreme both in breadth and in the danger it poses to human health and the environment.

4. In addition, there is significant contamination in the Sweetwater and Adair Creeks downstream of likely discharge points . . . in the Mill area.

6. . . . MDNR has documented a release from the tailings pond into the Ozark Aquifer, on information and belief creating a risk to domestic wells near the Mine and Mill.

7. . . . The high concentrations of lead and other toxic substances are being detected at or near the surface with the highest concentrations closest to Doe Run's Mill and the haul road, suggesting lead contamination emanates from the Mill and haul trucks that carry ore concentrate from the Mill.

8. . . . Lead is a probable human carcinogen known to cause brain damage in humans . . . . Arsenic is a known human carcinogen that can cause death or nerve damage in humans and animals . . . . Thallium is another known human carcinogen . . . . Cadmium inhalation can lead to respiratory tract problems, renal failure, or liver and kidney damage. Chromium, nickel, manganese, and zinc also can cause serious injury to human health and/or the environment.

11. . . . On information and belief, the dam holding back the Mine and Mill's lead-contaminated tailings pond and tailings pile . . . has been in use almost thirty years. A dam failure would release a toxic stew that would likely cover thousands of acres with a poisonous sheen.

The complaint then asserted six statutory and common law tort causes of action, plus two contract claims that are not here at issue:

COUNT I -- Violation of RCRA -- Hazardous Waste

25. The Mill generates ore concentrate, which contain[s] toxic substances including lead. The haul trucks then haul loads of the ore concentrate from the Mill on the haul road.

26. On information and belief, ore concentrate is released from the Mill and haul trucks and contaminates the soil, air, and water at and near the Mill. In many instances, Doe Run then abandons the released ore concentrate where the contamination occurs.

27. When ore concentrate is released from the Mill area and the haul trucks and Doe Run leaves the released concentrate on Doe Run's and/or Nadist's property, this constitutes the discarding, disposal, and/or abandonment of a hazardous waste [in violation of 42 U.S.C. § 6923].

COUNT II -- Violation of RCRA -- Solid Waste

39. . . . Doe Run has allowed water and wind to carry toxic tailings from the tailings pile and pond onto nearby property and into nearby surface water [entitling Nadist to relief under 42 U.S.C. § 6972].

COUNT III -- Violation of the Clean Water Act

51. On information and belief, including the MDNR's sampling, toxic contaminants including lead, zinc, arsenic, and thallium are being discharged from one or more unpermitted point sources into the Sweetwater and Adair Creeks . . . . from the Mill area [which constitutes the discharge of pollutants in violation of 33 U.S.C. § 1311(a)].

COUNT IV -- Violation of the Clean Air Act

59. . . . [L]ead and other materials are being released or are emanating from the Mine and Mill site, including windborne lead from haul trucks operated by Doe Run that access the site to remove lead ore concentrate from the site [in violation of 42 U.S.C. § 7604].

COUNT V -- Trespass

64. Without Nadist's authorization, Doe Run has released toxic substances lead, zinc and lead tailings but also other substances including arsenic, cadmium, chromium, copper, manganese, nickel, and thallium, onto real property owned by Nadist.

66. Doe Run has allowed the pollution of and trespass upon Nadist's property to continue largely unabated, despite knowing the toxins emitted from Doe Run's operations pose an imminent risk to human health and the environment.

COUNT VI -- Nuisance

70. Without Nadist's authorization, Doe Run has released and on a regular or semi-regular basis is releasing toxic substances including lead onto real property owned by Nadist. Such releases impede Nadist's operations and endanger Nadist's employees and others on its property.

**II.**

Lexington's CGL policies broadly insured Doe Run against liability to third parties for bodily injury or property damage caused by an "occurrence." For purposes of this appeal, it is agreed that the tort claims asserted in the Nadist Lawsuit fell within these insuring provisions. However, all eight policies included what is known as an "absolute" pollution exclusion. In the policies issued between 1998 and November 2004, this provision excluded -

bodily injury or property damage . . . caused by, contributed to or arising out of the actual or threatened discharge, dispersal, release, or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, pollutants or contaminants into or upon the land, the atmosphere or any course or body of water, whether above or below ground . . . whether or not such is sudden or gradual, and

-6-

whether or not such is accidental, intended, foreseeable, expected, fortuitous or inevitable, and wherever such occurs . . . .

In the policies issued to Doe Run from November 2004 through 2006, this provision excluded -

"Bodily injury" or "property damage" which would not have occurred in whole or part but for the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of pollutants at any time. . . . Pollutants means any solid, liquid, gaseous, or thermal irritant or contaminate including smoke, vapor, soot, fumes, acid, alkalis, chemicals and waste. Waste includes material to be recycled, reconditioned or reclaimed.

In the September 2009 letter tendering defense of the Nadist Lawsuit to Lexington, Doe Run's counsel asserted:

The environmental allegations are not limited to "pollutants." Rather, they include allegations concerning metals and other commercial materials that have been used, generated or stored at the Sweetwater Mine and Mill, or that have been hauled to and from the Mine and Mill, and that do not qualify as "pollutants." . . . The law makes clear that materials a company uses or sells, and which are in the industrial environment where the company routinely works, are not "pollutants."

In a lengthy letter dated November 30, 2009, explaining why Lexington was denying coverage and the duty to defend, Lexington's Account Specialist handling these claims, after quoting this assertion, responded:

The "commercial material" that is the subject of the above allegations is ore concentrate. Based on our investigation, the court [in the Nadist Lawsuit] has already determined that ore concentrate is a hazardous waste subject to RCRA regulation. . . . Doe Run argued that Nadist could not state a RCRA Subchapter III claim against it because ore concentrate

-7-

was either virgin material, or, if it was a waste, it was not a hazardous waste subject to Subchapter III regulations. The court rejected Doe Run's assertions . . . .

The court's order clarifies that for purposes of this suit Nadist has pled that ore concentrate is hazardous waste. The pollution exclusion bars coverage for property damage . . . caused by, contributed to or arising out of the actual or threatened discharge, dispersal, release, or escape of waste materials into or upon the land, the atmosphere or any course or body of water . . . Therefore, the allegations citing to Doe Run's operation of haul trucks carrying ore concentrate from the Mill as a source of liability are precluded from coverage under the pollution exclusion of [the enumerated] Lexington policies . . . .

\* \* \* \* \*

Lexington's coverage position is based on the information presently available to us. . . . Should you have any additional information that you feel would either cause us to review our position or would assist us in our investigation or determination, we ask that you advise us as soon as possible.

The district court concluded that the allegations in Nadist's First Amended Complaint "all fit squarely within the language of the pollution exclusions in the policies." We agree. The general fact allegations in Nadist's pleading reflect a prototypical complaint for relief from environmental property damage. More importantly, each of Nadist's six tort causes of action, including the common law trespass and nuisance claims, were *entirely* premised on allegations that Doe Run is liable to Nadist for causing the "release" or "discharge" of "hazardous wastes," "toxic substances," and "contaminants," mirroring the language of Lexington's absolute pollution exclusions. It is hard to imagine a more perfect overlap between the allegations in a third party's underlying complaint and the operative language of a pollution exclusion. Compare City of Sparta, 997 S.W.2d at 552 ("To hold the Absolute Pollution Exclusion does not bar coverage for damage caused by toxic

substances from sludge removed from sewage by Sparta's wastewater treatment facility would leave one wondering what kind of activity would be excluded.").

## III.

Rather than challenge this fact-intensive analysis, Doe Run argues on appeal that Lexington's pollution exclusions do not apply as a matter of law.

**A.** Relying on Hocker Oil Co. v. Barker-Phillips-Jackson, Inc., 997 S.W.2d 510 (Mo. App. 1999), Doe Run first argues that Lexington's pollution exclusions are ambiguous as applied to the Nadist Lawsuit because Doe Run is in the business of producing lead concentrate; therefore, in purchasing a CGL policy, Doe Run would reasonably believe that its product is not an excluded "pollutant." In Hocker Oil, the insured, a gas station, was sued by neighboring land owners after a drain plug in its underground gasoline storage tank failed and 2,000 gallons of gasoline were released into the ground. Id. at 512. The insurer's "garage policy" included an absolute pollution exclusion containing the same definition of "pollutants" as the 2004-2006 Lexington policies. Id. at 512-13. Electing to follow the minority position of the Supreme Court of Indiana in American States Ins. Co. v. Kiger, 662 N.E.2d 945 (Ind. 1996), the Missouri Court of Appeals held that the exclusion was ambiguous as to whether gasoline was a pollutant and therefore the insured was entitled to coverage:

> Hocker is in the business of transporting, selling and storing gasoline on a daily basis. Gasoline is not a pollutant in its eyes. Gasoline is the product it sells. . . . Hocker was entitled to characterize gasoline in a manner consistent with its daily activities absent specific policy language to the contrary. Ranger's failure to identify "gasoline" as a pollutant in its pollution exclusion resulted in uncertainty and indistinctness. . . . Being ambiguous, the policy provision is construed against [the insurer]. 997 S.W.2d at 518.

-9-

Like the district court, we conclude that <u>Hocker Oil</u> does not mandate the conclusion that Lexington's pollution exclusions are ambiguous as applied to the Nadist Lawsuit. First, the court in <u>Hocker Oil</u> expressly limited its holding to gasoline, stating that cases involving other substances were "not particularly helpful" to its analysis because "[c]lauses can, of course, be ambiguous in one context and not another." <u>Id.</u> at 516 (quotation omitted). Thus, <u>Hocker Oil</u> simply does not carry the weight of controlling precedent that Doe Run ascribes to it.[2]

Second, less than four months after the decision in <u>Hocker Oil</u>, a panel of the same division of the Missouri Court of Appeals that included two of the three judges who unanimously decided <u>Hocker Oil</u> unanimously decided <u>City of Sparta</u>. In that case, the insured City provided wastewater treatment facility sludge to a farmer who applied it as fertilizer, and toxic substances in the sludge migrated to a neighboring dairy farm, allegedly damaging the neighbor's herd. 997 S.W.2d at 546. Though the sludge was obviously a commercially valuable byproduct of the City's wastewater treatment operations, the court held, without even citing <u>Hocker</u>, that a virtually identical absolute pollution exclusion unambiguously barred coverage and the duty to defend:

---

[2]Doe Run argues that <u>Hocker Oil</u> is controlling precedent in this diversity action because the Supreme Court of Missouri denied the insurer's application to transfer the case from the Court of Appeals. <u>Hocker Oil Co. v. Barker-Phillips-Jackson, Inc.</u>, No. 81818 (Mo. Aug. 24, 1999). This contention is without merit. Many Missouri cases recognize that the denial of transfer does not denote Supreme Court approval of a lower court decision. Thus, we follow intermediate appellate court decisions "when they are the best evidence of Missouri law," <u>Washington v. Countrywide Home Loans, Inc.</u>, 655 F.3d 869, 873 (8th Cir. 2011), but not when relevant precedent, considered dicta, and other reliable data persuade us that the Supreme Court of Missouri would not apply a decision in the manner urged. <u>See</u> <u>Rashaw v. United Consumers Credit Union</u>, 685 F.3d 739, 743-44 (8th Cir. 2012), <u>cert. denied</u>, 133 S. Ct. 1250 (2013).

> Inasmuch as (1) the substance at issue in the instant case is sludge, (2) Rollers pled the sludge contained substances toxic to humans and animals, which caused Rollers' damage, and (3) the Absolute Pollution Exclusion bars coverage for damage arising from exposure to toxic substances, this court holds the Absolute Pollution Exclusion is not ambiguous regarding whether Rollers' damage is barred from coverage under [the policy]. Id. at 551.

At oral argument, Doe Run asserted that lead concentrate was its "primary product," like the gasoline in Hocker Oil and unlike the sludge in City of Sparta. But *discarded or abandoned* lead concentrate and tailings are not products Doe Run intends to sell. That its toxic or hazardous materials are valuable products if Doe Run properly contains them does not make them any less "pollutants" when they are abandoned and released into the environment. Accord United States v. Standard Oil Co., 384 U.S. 224, 229 (1966) ("The word 'refuse' . . . is satisfied by anything which has become waste, however useful it may earlier have been."); Pipefitters Welfare Educ. Fund v. Westchester Fire Ins. Co., 976 F.2d 1037, 1044 (7th Cir. 1992) ("one could not characterize the discharge onto land of 80 gallons of PCB-laden oil as anything but pollution"). The Nadist complaint alleges property damage only by reason of Doe Run's releasing of abandoned hazardous wastes and toxic substances into the environment.

Finally, in construing the word "pollutant" in an absolute pollution exclusion, Hocker Oil focused on whether gasoline was the insured's product, rather than on its toxic characteristics when accidentally released into the environment. That focus was a minority position when adopted, has been almost uniformly rejected by appellate courts in other jurisdictions, and has not since been cited or referred to favorably by the Supreme Court of Missouri. See, e.g., Mont. Pet. Tank Release Comp. Bd. v. Crumleys, Inc., 174 P.3d 948, 956-59 (Mont. 2008) (collecting cases and declining to follow Hocker Oil). As one court concluded, correctly in our view, "even though gasoline that is in [an underground storage tank] is a 'product' for purposes of other

parts of the insurance policy, when the gasoline escapes or reaches a location where it is no longer a useful product it is fairly considered a pollutant." Whittier Props., Inc. v. Alaska Nat'l Ins. Co., 185 P.3d 84, 91 (Alaska 2008).

The Supreme Court of Missouri has noted that courts may not "create an ambiguity in order to distort the language of an unambiguous policy, or, in order to enforce a particular construction which it might feel is more appropriate." Rodriguez v. Gen. Accident Ins. Co. of Am., 808 S.W.2d 379, 382 (Mo. 1991). Applying that principle, we conclude the Supreme Court of Missouri would not interpret Hocker Oil in the manner urged by Doe Run in this case, which involves a sophisticated insured and the kind of underlying environmental liability claims that the exclusion was primarily intended to exclude. See generally Apana v. TIG Ins. Co., 574 F.3d 679, 682-83 (9th Cir. 2009).

**B.** Beginning in November 2004, the standard terms and conditions in Lexington's CGL policies added a specific lead exclusion which excluded:

> "Bodily Injury" or "Property Damage", for past, present or future claims arising in whole or in part, either directly or indirectly, out of the manufacture, distribution, sale, resale, re-branding, installation, repair, removal, encapsulation, abatement, replacement or handling of, exposure to, ingestion of or testing for, lead whether or not the lead is or was at any time airborne as a particle, contained in a product, carried on clothing, inhaled, transmitted in any fashion or found in any form whatsoever . . . the cost of disposal of lead substances or the taking of such other action as may be necessary to temporarily or permanently prevent, minimize or mitigate damage to the public health or welfare or to the environment, which may otherwise result . . . .

As Doe Run was in the business of mining and processing lead and selling lead products, this new exclusion was, understandably and necessarily, deleted "in its entirety" by an endorsement to Doe Run's 2004-2006 CGL policies.

Doe Run argues that the deletion of this broader lead exclusion created an ambiguity that precludes application of the absolute pollution exclusion to liability claims relating to lead-based substances.  We disagree.  Under Missouri law, an exclusion "has no function to endow coverage."  <u>Transp. Indem. Co. v. Teter</u>, 575 S.W.2d 780, 784 (Mo. App. 1978); <u>see</u> <u>Miller v. Home Ins. Co.</u>, 605 S.W.2d 778, 780 (Mo. 1980).  Likewise, the absence of an exclusion, standing alone, does not imply coverage; coverage must be provided in the remaining policy terms.  This common sense principle was well illustrated by <u>Truck Ins. Exch. v. Heman</u>, 800 S.W.2d 2, 4 (Mo. App. 1990), where the court held that the parties' decision not to include an optional additional exclusion in an insurance policy did not "suggest[] a modification of the exclusions contained in the body of the policy."  Here, the more specific lead exclusion, if included, would have overlapped the absolute pollution exclusion as it applies to the release of lead "pollutants," but the two exclusions would not have conflicted.  The parties' deletion of the lead exclusion left the remainder of the CGL policy in full force and effect, including its absolute pollution exclusion.

The judgment of the district court is affirmed.

_____