**UNITED STATES of America, Plaintiff,**

v.

**Elizabeth Carter EDWARDS and Elizabeth Carter Edwards, Executrix of the Estate of Joseph Carter, Defendants.**

No. 80–1038.

United States District Court, W.D. Tennessee, E.D.

July 23, 1987.

William D. Evans, Jr., U.S. E.P.A., Land & Natural Resources Div., U.S. Dept. of Justice, Washington, D.C., and Patrice Dickey, Asst. Dist. Counsel, U.S. Army Corps. of Engineers, Memphis, Tenn., for plaintiff.

T.J. Emison, Jr., Alamo, Tenn., for defendants.

## MEMORANDUM OPINION

TODD, District Judge.

This action arises out of alleged violations of the Rivers and Harbors Act of 1899, 33 U.S.C. § 401 *et seq*, and § 404 of the Clean Water Act of 1977, 33 U.S.C. § 1311, *et seq*. This Court, sitting without a jury, heard evidence on July 21, 22, and 23, 1986. Based upon the evidence presented, the Court issues this memorandum opinion.

## I. PROCEDURAL HISTORY

1. Beginning in July 1978, defendant Joseph Carter engaged in unlawful construction activity that resulted in damage to approximately 300 acres of wetlands. When defendant Joseph Carter ignored repeated requests by the U.S. Army Corps of Engineers, hereinafter referred to as "Corps of Engineers", to cease such unlawful activity, plaintiff filed its complaint alleging that defendant Joseph Carter was violating the Clean Water Act, 33 U.S.C. §§ 1251–1376, and the Rivers and Harbors Act of 1899, 33 U.S.C. §§ 401–426i. By this action, plaintiff seeks civil penalties under Section 309(d) of the Clean Water Act, 33 U.S.C. § 1319(d), and injunctive relief pursuant to Section 309(b) of the Clean Water Act, 33 U.S.C. § 1319(b), and Section 406 of the Rivers and Harbors Action of 1899, 33 U.S.C. § 406.

2. After the filing of the complaint, plaintiff and defendant Joseph Carter entered into a Consent Injunction that was entered in this Court on June 24, 1981. By this Consent Injunction, defendant Joseph Carter was enjoined from discharging dredged or filled material onto wetlands.

3. Thereafter, plaintiff filed a Motion for Partial Summary Judgment. In his March 21, 1982, Report and Recommendation, U.S. Magistrate James H. Allen recommended that plaintiff's Motion for Partial Summary Judgment should be granted. Subsequently, District Judge Odell Horton adopted the Report and Recommendation by Order dated March 15, 1983.

4. On August 5, 1985, defendant Joseph Carter died and defendant Elizabeth Carter Edwards was subsequently named the Executrix of the Estate of Joseph Carter by the Probate Court of Crockett County, Tennessee. On September 1, 1985, a Suggestion of Defendant's Death was filed in this Court and on November 21, 1985, this Court entered an order granting a motion for substitution whereby defendant Elizabeth Carter Edwards, Executrix of the Estate of Joseph Carter, deceased, was substituted as a party defendant in this action.

5. On July 21, 1986, this Court granted plaintiff's Motion to Amend Complaint whereby defendant Elizabeth Carter Edwards, individually, was named as a party defendant in this action. This amendment was necessitated as a result of Elizabeth Carter Edwards' inheritance of the subject real property from defendant Joseph Carter.

6. Since plaintiff's Motion for Partial Summary Judgment has been granted, defendants have been adjudicated to be in violation of the Clean Water Act and the Rivers and Harbors Act of 1899 since July 1978. Thus, the only remaining issue is the appropriate relief, *i.e.*, injunctive relief and civil penalties, that should be granted to address the statutory violations.

## II. FINDINGS OF FACT

### A. WETLANDS AND THEIR ROLE IN THE ENVIRONMENT

1. Wetlands are transitional areas between open water, such as a lake or a river, and a site that is designated as an uplands or a dry site. It is an area that is typified by vegetation, wildlife, and aquatic life that is adapted to that particular environment where the water fluctuates.

2. Thomas C. Welborn, a wetlands ecologist and environmental scientist, described the vital role wetlands play in the total environment:

"Well, they provide a number of values or benefits to the public. Some of these are flood storage; that is, they hold the water during flooding during the winter and spring. They release the water slowly. And they provide habitat for fish and wildlife, just as I mentioned. They provide benefit for waste treatment or water treatment. When the water flows over the property, sediments and pollutants drop out and are absorbed by the wetlands. They provide a variety of nonconsumptive uses such as bird watching; aesthetic purposes such as Reelfoot Lake, which is close by. Consumptive uses are hunting, fishing, trapping. These are all benefits that are provided by wetlands of the type that we're discussing."

Mr. Welborn described how wetlands improve water quality:

"Well, the type of wetlands we're talking about, bottomland hardwood-shrub swamp complex such as this, as the water flows across the wetlands, the water is slowed down. As this occurs, the sediments and pollutants that are associated with sediments or tied to the sediments drop out as the water slows. So this acts to cleanse the water, reducing the numbers of pollutants or sediments in this water."

### B. NAVIGABILITY OF THE SOUTH FORK OF THE FORKED DEER RIVER

3. The South Fork of the Forked Deer River, hereinafter referred to as "SFFDR", flows into the Forked Deer River and thence into the Obion River. The SFFDR, Forked Deer River and Obion River were in the past and are today susceptible to navigation by canoes, rowboats or other craft.

### C. THE JOSEPH CARTER PROPERTY

4. Defendant Joseph Carter owned real estate in Haywood County, Tennessee, with frontage on Tennessee State Highway No. 54 near Owl City, Tennessee. A portion of Joseph Carter's real estate is located adjacent to the SFFDR. The total real estate previously owned by defendant Joseph Carter was approximately 2200 to 2400 acres. This property is hereinafter sometimes referred to as the "Carter property".

5. Defendant Joseph Carter died on August 5, 1985, testate and a resident of Crockett County, Tennessee. Thereafter, defendant Elizabeth Carter Edwards, a resident of Crockett County, Tennessee, was appointed as the Executrix of the Estate of Joseph Carter, deceased, by the Probate Court of Crockett County, Tennessee. Pursuant to the Last Will and Testament of Joseph Carter, defendant Elizabeth Carter Edwards has acquired title to the real estate that is the subject of this cause of action.

6. Within the property now owned by defendant Elizabeth Carter Edwards, the Corps of Engineers has determined that approximately 600 acres were wetlands.

7. Located within the property now owned by defendant Elizabeth Carter Edwards are two tracts of real estate purchased in 1981 and now owned by Larry Carter Edwards, his wife, and his father. These two parcels of real property are hereinafter referred to as Parcels I and II of the Jameson Tract. Parcel I of the Jameson Tract consists of approximately 50 acres located along the north bank of the SFFDR. The Southeast corner of Parcel I of the Jameson Tract is located approximately 150 to 200 feet from the Tennessee State Highway No. 54 Bridge. The distance from the Southwest corner of Parcel I of the Jameson Tract to the Southeast corner of Parcel II of the Jameson Tract is

approximately 300 feet. Parcel II of the Jameson Tract is approximately 15 to 20 acres. Both Parcels I and II of the Jameson Tract are located along the north bank of the SFFDR. Surrounding both Parcels I and II of the Jameson Tract and northward is real property previously owned by defendant Joseph Carter and now owned by defendant Elizabeth Carter Edwards.

## D. STATUTORY VIOLATIONS

8. Thomas C. Welborn, formerly an employee with the Corps of Engineers and now employed by the U.S. Environmental Protection Agency, hereinafter referred to as "EPA", inspected the Carter property on August 3, 1978, August 21, 1978, October 19, 1978, April 24, 1979, July 25, 1979, June 7, 1979, May 7, 1981, and July 17, 1986.

9. On August 3, 1978, Thomas C. Welborn inspected the Carter property as a result of reports of two (2) alleged statutory violations from the Fish and Wildlife Service, U.S. Department of Interior. During this inspection, he noticed a culvert and flapgate that had been placed through the top bank of the SFFDR. This culvert and flapgate connected to a ditch that ultimately connected to an oxbow lake, known as the Big Eddy. Thus, this ditch connected SFFDR with the Big Eddy. He noticed the deposition of dredged material into wetlands adjacent to the Big Eddy in connection with the ditch construction. This ditch was approximately 1500 to 2000 feet in length and approximately 15 feet wide. On each side of the ditch, approximately 900 cubic yards of spoil material were deposited on the banks. During an inspection of the north bank of the SFFDR, he did not observe any levee along the bank and observed no dredged materials in the wetlands along the SFFDR.

10. The next visit by Thomas C. Welborn to the Carter property was on August 21, 1978. He showed defendant Joseph Carter the ditch where deposits of spoil material had been made in wetlands and gave him a permit application for later submittal to the Corps of Engineers. Despite receiving a permit application, defendant Joseph Carter never submitted the permit application to the Corps of Engineers.

11. On October 19, 1978, Welborn again inspected the Carter property, and observed land clearing activities northeast from the Big Eddy at the center of the Carter property.

12. On April 24, 1979, Welborn and David R. Parsons, employed by the Fish and Wildlife Service of the U.S. Department of Interior, met with defendant Joseph Carter and his grandson, Larry Carter Edwards. While conducting an inspection along the SFFDR, they observed that a levee was being constructed adjacent to the north bank of the SFFDR and that deposits of spoil material had been made in wetlands along the SFFDR. At that time, the levee was approximately 4 to 6 feet high and approximately 10 feet wide.

13. On June 7, 1979, the Corps of Engineers issued a Cease and Desist Order to Defendant Joseph Carter. This Order mandated that all work in connection with deposit of dredged material into wetlands or navigable waters of the United States cease. On July 30, 1979, the Corps of Engineers issued a similar Cease and Desist Order to defendant Joseph Carter. Subsequently, the Corps of Engineers requested defendant Joseph Carter to provide information concerning his activities that would require a permit. Defendant Joseph Carter did not reply to this letter or comply with the Cease and Desist Orders.

14. On July 25, 1979, Welborn again inspected the property. While walking along the northbank of the SFFDR, he noticed several areas where dredged material had been placed in wetlands along the levee. Moreover, while walking through the center of the property, he "observed several locations where dredged material had been placed in slough." He estimated that approximately 800 cubic yards of spoil material had been placed in the sloughs and along the levee.

15. On August 7, 1979, Thomas C. Welborn made an aerial inspection of the Carter property and observed the use of a backhoe along the north bank of the SFFDR. Further, he also observed the use

of a bulldozer operating and pushing spoil material along the north side of the SFFDR in preparation for the construction on the levee.

16. During his next inspection on May 7, 1981, Welborn noticed that the ditch leading from the Big Eddy had been filled with sand. Further, he noticed that "blowouts" or breaches of the levee had occurred resulting in extensive deposits of sand on the north bank of the SFFDR. At the center portion of the property, he again noticed that spoil material had been deposited into sloughs as a result of land clearing activity in the center of the Carter property. During the May 7, 1981, inspection, Thomas C. Welborn observed:

Q. And let me hand you Exhibit No. 1. Could you point out specifically where you viewed these additional violations?

A. The additional violations that we saw—one, we found a new ditch which had been constructed. On this photograph it's in the north left-hand corner. There was a ditch which had been constructed through a marsh area in the northeast corner of the property; and material had been placed on either side as shown by this 1980 photograph, these white dots, which would indicate spoil material being placed on either side of the ditch and placed in an area classified as wetlands. The other observations we made were near the center of the property along the main slough, and material had been pushed from the adjacent wetlands south and north of the slough into the slough itself.

17. David R. Parsons, an expert in wetlands ecology, inspected the site beginning on July 12, 1978, and ending in mid-1982. He described the Carter property and the activities of defendant Joseph Carter as follows:

Q. Would you describe generally the construction activity that you saw during the period of observation that took place on that property?

A. Yes. This was activity that was similar to many that were going on in this region. It involved the conversion of wetlands to an agricultural use through the construction of ditches and levees and the knocking down of the trees with a bulldozer and piling those into windrows and then setting them on fire to reduce the residue; and then that's leveled out, ultimately, so that there's no evidence of that left. And the end result is a conversion of the wetlands to an agricultural use.

Q. Prior to 1978 when you first observed this property, immediately prior to that, was this property susceptible to being subject to an agricultural use?

A. Well, I suppose any piece of property might be susceptible, but this was a particularly wet tract—judging from observations of aerial imagery taken prior to that time, this was a particularly wet area.

Q. Was it being used for agricultural purposes when you first saw it?

A. No, it was not; and I have not observed any evidence to indicate that it was being used prior to that time.

Q. Could it have been used at that time for agricultural purposes without the construction activities and conversion activities you've described?

A. In my opinion, no, it could not have been.

18. Defendant Joseph Carter conducted or caused to be conducted repair work at a "washout" or "blowout" that occurred in the levee along the SFFDR.

19. Defendant Joseph Carter placed or caused to be placed a flapgate in the culvert.

20. The ditch leading from the Big Eddy resulted in the lowering of the water level in the Big Eddy and the lands adjacent thereto. Defendant Joseph Carter deposited or caused to be deposited material excavated from the ditch.

21. Defendant Joseph Carter cleared vegetation from or caused vegetation to be

cleared from the subject real property or portions thereof. Moreover, heavy equipment was used to conduct the clearing activities.

22. After defendant Joseph Carter was advised by representatives of the Corps of Engineers to stop further work along the levee adjacent to the SFFDR, he agreed to stop further work.

23. Prior to July 1978, defendant Joseph Carter dug a drainage ditch across his property from the Big Eddy to the SFFDR and placed a culvert that connected the ditch and the SFFDR.

24. Defendant Joseph Carter never received a permit from the Corps of Engineers.

25. As a result of the activities of defendant Joseph Carter, approximately 300 acres of wetlands have been damaged since 1978.

E. VIOLATIONS OF CONSENT INJUNCTION

26. The June 24, 1981, Consent Injunction enjoined defendant Joseph Carter from discharging dredged or filled materials into wetlands.

27. An examination of 1984 aerial photographs reveals newly deposited dredged or spoil material placed in ditches or in sloughs located on the Carter property. This dredged or spoiled material was not present in the photographs of the Carter property taken in 1981 and 1982.

F. ENVIRONMENTAL HARM

28. Thomas C. Welborn described the adverse effect that the land clearing activities on the Carter property had upon the environment:

"Primarily, the levee would reduce flooding on the property. And this would have impacts on several values or benefits that the wetlands would have. It would reduce flooding length, duration. It would also prevent some floodings— flooding from actually occurring at any time. So it would reduce the frequency of flooding.

This would impact things such as water quality in that the area would not be able to improve water quality or allow sediments to drop out during the flooding. It would also prevent fish from utilizing the area for spawning. The activity of the land clearing would reduce the habitat. It would also impact, to some extent, the water quality.

Other impacts would be the drainage ditches, which would also remove water and remove it quickly. It would reduce the aquatic habitat which would occur on the site. Leveling of the land would reduce the extent of aquatic—the aquatic environment by filling in sloughs and decreasing the potential for deep-water habitat on the site."

29. David R. Parsons described the damage to the environment caused by activities on the Carter property:

"With regard to the production of wildlife, the physical and vegetative diversity of the site has been significantly altered; and in place of that complex of sloughs, particularly in the center part of the tract, we have at least an attempt toward a monoculture type—agricultural operation. What this does, in essence, is offer one species of plant in replacement for a whole complex of plants that existed there naturally. And, of course, the suitability of that as habitat of species is much diminished.

With regard to one of the functions of these areas that I didn't get into much detail is that they serve as wintering areas for waterfowl. And what we have is a loss of a great deal of cover which is required by wintering fowl, for a variety of reasons: for protection from predation, and they go through a period of molt when they can't fly and they need to have a cover to escape to. The construction of the levee precludes water moving into that area with the—to the degree that it had previously and would render that habitat—some of that habitat unsuitable then for wintering waterfowl. Basically, that's the same situation for the fisheries. If the waste is precluded from coming onto the site, then its value for fisheries is diminished substantially

in that they no longer have access to spawning sites and nursery areas for the young fish.

The Big Eddy feature itself is something that we've always keyed in on because of its uniqueness to the area.... Later this area was cleared, too, so the whole thing, from the highway to this Big Eddy complex, ultimately was cleared. Flood waters come out and run across that; and, of course, the soil is no longer protected as well as it was formerly, and it's not tied down, necessarily, with vegetation. That allows not only that area to erode but also diminishes the functions I mentioned earlier; and this area will begin to attract sediment and pollutants and funnel all that stuff down into the Big Eddy complex where those same functions must then occur in the Big Eddy. This area formerly served basically as a buffer and protected the Big Eddy from polluted waters and a great deal of sediment and deposition.... [T]he levee precludes—would preclude the water from entering the land; so even if the wetlands were left intact, they would not get the water delivery that they formerly had and, therefore, wouldn't be capable of performing those cleansing functions that I spoke of, the trapping of sediment and detoxifying pollutants. In addition to that we, in fact, have had wetland vegetation removed from the land, so that would also diminish their capability for processing pollutants and also reduce the resistance to flow, so you wouldn't get the settling of sediment as efficiently as was previously the case."

30. As a result of the land clearing activities of defendant Joseph Carter, the monetary loss to the public as a result of the destruction of wetlands was estimated to be "several hundred thousand dollars worth of value for the total acreage that was cleared." While an exact sum cannot be determined, Thomas C. Welborn stated "my opinion would be that it was of great value to the public from a wetland standpoint."

## G. RESTORATION PLAN

31. To allow the subject of the Carter property to become functional again as a wetlands, an appropriate restoration plan would require the removal of the levee adjacent to the north bank of the SFFDR to reinstate periodic flooding, the filling of the ditches that were constructed on the center portion of the Carter property, and the natural revegetation of the cleared lands to return the wetlands.

32. The preservation of the Big Eddy is one of the primary objectives of the restoration plan. Under the restoration plan, the former wetlands in the center portion of the Carter property would be allowed to naturally revegetate to wetlands. Since drainage on the Carter property moves from a northeast to a southwest direction, the center portion of the property upon returning to wetlands would trap sediment. Thus, a buffer zone would be created that would prevent the Big Eddy from silting in with sediment.

33. Defendant Elizabeth Carter Edwards has sufficient equipment, *i.e.*, two bulldozers and a backhoe, to perform the restoration work.

34. Under the restoration plan, it would take approximately 19 to 20 days and cost approximately $2300 to degrade the levee. For the ditch refilling in the center portion of the Carter property, the restoration would take about 10 days and cost about $1200. This nominal cost results from the fact that defendant Elizabeth Carter Edwards has the necessary equipment on site to perform the restoration plan.

## H. EFFECT OF THE WEST TENNESSEE TRIBUTARIES PROJECT ON THE RESTORATION PLAN

35. Defendant contends that the West Tennessee Tributaries project, hereinafter referred to as "WTTP", will result in the building of culverts, flapgates, lateral drainage ditches, and levees not unlike those complained of on the Carter property. Defendant contends that it would be inequitable to order defendant to fill in drainage ditches, take out culverts, and remove levees when the Government plans to dig

drainage ditches, install culverts, and build levees in the same area.

36. The "WTTP" involves seven river systems including the SFFDR. Although this project was initially authorized by Congress in 1948, it has been mired in litigation and has never been substantially begun, much less completed. As part of a settlement of pending litigation, the WTTP and any future snagging and clearing operations of the Obion Forked Deer Basin Authority is contingent upon riparian property owners granting certain easements. In order for these projects to proceed, it is necessary for thirty percent (30%) of riparian owners to grant a conservation easement within a particular area or "reach". Moreover, before any lateral drainage can be installed, an easement must be obtained from at least eighty percent (80%) of the owners within a particular area.

37. Once these easements have been obtained, WTTP cannot proceed until the necessary permits have been obtained through a water quality certification process.

38. This water quality certification process could result in the alteration of the Corps' General Design Memorandum.

39. Even if the General Design Memorandum was implemented on the north bank of the SFFDR adjacent to the Carter property, it would not result in a continuous levee. David R. Parsons testified that "what the Corps' levee would be, assuming that the Corps project is built through that area, would be a series of discontinuous piles of spoil material." "It would be broken by design, at any rate, and be broken every time they encounter a natural drainageway type situation." Since no final design has been completed, the General Design Memorandum is "very theoretical and conceptual at this point."

40. The Carter property is located on the "reach" of the WTTP known as Folkes Item 1–2. Beginning in the fall of 1985, the Obion-Forked Deer Basin Authority began seeking consent from the riparian owners to obtain the necessary consentual easements. J. Richard Swaim, Executive Director of the Obion-Forked Deer Basin Authority, stated "we have contacted some thirty-five to forty-four pivotal landowners; that is, those landowners that are along the river itself. And we've got about a third of what we need." Thus, since the conservation easements have not been obtained at this time, the WTTP cannot proceed in the vicinity.

41. Therefore, the WTTP has no impact upon the Court's decision or upon the remedy to be ordered.

**I. PRESENT USE OF PROPERTY AND FAILURE TO RESTORE**

42. Since 1984, defendants allowed the converted wetlands to lie fallow under a government subsidy program.

43. Since acquiring the property in August 1985, defendant Elizabeth Carter Edwards has not restored the wetlands.

**J. EFFECT OF RESTORATION PLAN UPON PERSONS WHO ARE NOT PARTIES**

Defendant contends that the restoration plan will affect the land of Larry Carter Edwards, who is not a party to this action. Specifically, defendant contends that removal of the levee along the SFFD would make Larry Carter Edwards' land unsuitable for its present agricultural use.

Defendant cites no authority for the proposition that "violations of the Clean Water Act may not be remedied if the remedy will affect adjoining landowners." The Court can find no such authority.

Violations of the Clean Water Act and the Rivers and Harbors Act may be remedied even if other property in the immediate area is affected. *See U.S. v. Sabine Shell, Inc.*, 674 F.2d 480 (5th Cir. 1982).

**K. APPLICABILITY OF THE CIVIL PENALTY**

Defendant has raised the issue of whether the civil penalty of 33 U.S.C. § 1344(s)(5) abates upon the death of the wrongdoer. In support of her position that it does, defendant relies upon *Schreiber v. Sharpless*, 110 U.S. 76, 3 S.Ct. 423, 28 L.Ed. 65 (1884). In *Schreiber*, private plaintiffs

brought a copyright infringement action against defendant Sharpless who was alive at the time the action was brought, but died before the case proceeded to judgment. After his death was suggested on the record, the plaintiffs sought to join his executor and executrix as parties defendant. Upholding the district court's finding that the action did not survive the defendant's death, the Supreme Court stated that "[t]he personal representatives of a deceased party to a suit cannot ... defend the suit after his death, unless the cause of action ... is one that survives by law." 110 U.S. at 80, 3 S.Ct. at 424. Federal law did not address this issue, so the Court relied upon the common law principle that "actions on penal statutes do not survive" a person's death. *Id.* The fact that the state had a law providing for survival of actions was irrelevant, since such laws "have no effect on suits in the courts of the United States for the recovery of penalties imposed by an act of Congress." *Id.*

*Schrieber's* holding that penal actions abate upon the death of the wrongdoer is still the law. In the case of a cause of action involving civil penalties, however, that holding must be considered in light of 28 U.S.C. § 2404, providing that "civil actions for damages commenced by ... the United States ... [do] not abate on the death of a defendant but ... survive and [are] enforceable against his estate." The determinative issue is thus whether the civil penalty of 33 U.S.C. § 1344(s)(5) is "penal." If it is, no civil penalty can be assessed.

■ In *Murphy v. Household Finance Corp.*, 560 F.2d 206 (6th Cir.1977), the court noted that the labels "penal" and "penalty" are often used to refer to civil actions in which "neither the liability imposed nor the remedy given is strictly penal." 560 F.2d at 209 (quoting *Huntington v. Attrill*, 146 U.S. 657, 667 (1892)). In light of that ambiguity, the court articulated a three-factor analysis to determine if such actions are "penal" for the purpose of determining survivability. 560 F.2d at 209. Those factors are:

1) whether the purpose of the statute was to redress individual wrongs or more general wrongs to the public; 2) whether recovery under the statute runs to the harmed individual or to the public; and 3) whether the recovery authorized by the statute is wholly disproportionate to the harm suffered.

*Id.* See also *Bowles v. Farmers Nat'l Bank*, 147 F.2d 425, 428 (6th Cir.1945). *Accord James v. Home Constr. Co.*, 621 F.2d 727, 730 (5th Cir.1980); *Smith v. No. 2 Galesburg Crown Fin. Corp.*, 615 F.2d 407, 414 (7th Cir.1980).

*Murphy, James,* and *Smith* all involved the statutory penalty provision of the Truth in Lending Act. In each of those cases, the court determined, using the three-factor analysis quoted above, that the penalty provision of the TILA was not penal, but remedial. Since the purpose of a private TILA action is to redress a wrong to an individual, who receives the penal award, and because this award is limited to the lesser of twice the finance charge or $1,000, it is not disproportionate to the harm suffered. See also *Porter v. Household Fin. Corp.*, 385 F.Supp. 336, 341 (S.D. Ohio 1974) ("The true test is whether the wrong to be remedied or punished is primarily to an individual or to the State.").

Cases involving survivability of the civil penalties of the Clean Water Act have not been found. However, many courts have considered this issue in the context of other federal statutes. For example, treble damage provisions in antitrust and patent actions are not "penal" and thus survive a defendant's death. The same result has been reached in cases involving civil fraud penalties in tax cases and in securities fraud actions. See *Porter*, 385 F.Supp. at 341 (cataloging cases). See also *Fishman v. Estate of Wirtz*, 594 F.Supp. 853, 892 (N.D.Ill.1984), *modified on other grounds,* 609 F.Supp. 982 (N.D.Ill.1985) (antitrust treble damages); *Continental Assurance Co. v. American Bankshares Corp.*, 483 F.Supp. 175 (E.D.Wisc.1980) (securities fraud action). There is a line of cases, however, holding that actual, but not treble damages, may be recovered from a defendant's estate in antitrust cases. See *Rogers*

v. Douglas Tobacco Board of Trade, 244 F.2d 471 (5th Cir.1957); RSE, Inc. v. H & M, Inc., 90 F.R.D. 185, 187 (M.D.Pa.1981); Shires v. Magnavox Co., 432 F.Supp. 231, 235 (E.D.Tenn.1976); Vandervelde v. Put an Call Brokers and Dealers Ass'n., 344 F.Supp. 118, 156–57 (S.D.N.Y.1972). Cf. Summers v. Federal Deposit Ins. Corp., 592 F.Supp. 1240, 1242 (W.D.Okla.1984) (treble damages not available from receiver of failed bank in antitrust action).

In contrast to cases in which enhanced damages or civil penalty provisions have been held to survive a defendant's death, the treble damages provision of the Emergency Price Control Act of 1942 was found to be penal and thus did not survive the death of the wrongdoer in Bowles v. Farmers Nat'l Bank, 147 F.2d 425 (6th Cir.1945). See also Porter, supra (listing additional Emergency Price Control Act cases). Similarly, the treble damages provision of the Defense Production Act of 1950 was found to abate on the death of the defendant in United States v. Price, 290 F.2d 525 (6th Cir.1961).

 Applying Murphy's three-factor analysis to the present case, the court concludes that the civil penalty provisions of the Clean Water Act are penal and do not survive Carter's death. The wrong the government is redressing in this action is one to the public, not to any particular person. Some argument can be made that Carter's neighbors suffered the most harm; however, there is no indication that the action was brought on their behalf. Indeed, most of the testimony concerning harm dealt with harm to the general public from the destruction of habitats for the wetlands animal and plant life.

Secondly, any civil penalty will be paid to the government and not to any individual. In the cases cited above and in Porter, it is especially noteworthy that in antitrust, patent/copyright infringement, securities fraud, and truth in lending actions, where the penalty survives the wrongdoer's death, any recovery of the so called "penal" damages is paid to the injured party and not the government. In the Emergency Price Control Act and Defense Produc-

tion Act cases, where the civil penalty was found not to survive the defendants' deaths, the penalty was paid to the government. This distinction, the second of the Murphy factors, appears critical.

That distinction must be considered, however, in light of the opinions finding that a tax penalty survives the taxpayer's death. See, e.g., Reimer's Estate v. Commissioner of Internal Revenue, 180 F.2d 159 (6th Cir.1950). In Reimer's Estate, the Sixth Circuit found the 50% civil fraud addition to tax owed remedial, noting that it was "for the protection of revenue and for reimbursement of the government for the heavy expenses of investigation and the loss resulting from a taxpayer's fraud." 180 F.2d at 159–60. Cf. Kahr v. Commissioner of Internal Revenue, 414 F.2d 621, 626 (2d Cir.1969) ("Death may be an avenue of escape from many of the woes of life, but it is no escape from taxes."). Although the tax cases reach a contrary result, they are not persuasive. The holdings in those cases are based on Helvering v. Mitchell, 303 U.S. 391, 58 S.Ct. 630, 82 L.Ed. 917 (1938), in which the Supreme Court held that assessment of the 50% civil fraud penalty was not barred by the acquittal of the taxpayer in a criminal action brought on the basis of the same alleged acts. That holding has been relied upon by the lower courts to find the civil fraud penalty remedial in nature. Because the tax cases do not analyze the issue using the factors later articulated in Murphy, the holding of those cases should be limited to tax cases. It is interesting to note that the tax cases were not mentioned in the opinion in Murphy, although antitrust and patent infringement cases were cited. 560 F.2d at 210 n. 5.

The first two Murphy factors appear to indicate that the civil penalty is just that, a penalty. The third factor, whether the civil penalty is disproportionate to the harm suffered, presents more difficulty. Some evidence was offered on the value of the destroyed wetlands. That value, representing the "harm suffered," is inherently difficult to assess. What is the value of a fish, a tree, or an active beaver colony? Obvi-

ously, the answer depends upon whom you ask. Because that value is not easily ascertainable and because any amount is arguably too little or too much, that factor does not appear critical in this case.

In summary, the civil penalty of 33 U.S.C. § 1344(s)(5) does not survive a defendant's death since 1) the purpose of the Clean Water Act is to redress a general wrong to the public and 2) any recovery of the civil penalty would go to the government and not an individual who has been harmed by the defendant. Further support for this result is found in the Act and its legislative history. An argument can be made, as it is in the tax penalty cases, that the civil penalty of 33 U.S.C. § 1344(s)(5) is remedial. However, the civil penalty is not intended to pay for the costs of restoring destroyed wetlands. In addition to the civil penalty, the Act also provides for injunctive relief. 33 U.S.C. § 1344(s)(3). Such relief encompasses an order requiring the wrongdoer to restore the wetlands at his own expense, as well as enjoining any future violations of the Act. Thus, it appears that the civil penalty provision serves no remedial purpose in the sense of restoration of the damage done in violation of the Act.

The argument can also be made that the civil penalty serves to reimburse the government for the expenses of investigating violations of the Act and enforcing it. This argument has little merit, as evidenced by the EPA's statements in its 1980 Civil Penalty Policy that "attorney's fees and court costs cannot be recovered by the federal government in civil enforcement actions" and "[t]hose costs which are routinely incurred by state and federal enforcement officials need not, however, be sought as part of a civil penalty." Environmental Protection Agency Civil Penalty Policy for Major Source Violators of the Clean Air Act and the Clean Water Act (July 8, 1980), Env't Rep. (BNA) 41:1101, 1105 (1984) (hereinafter 1980 Policy).

The legislative history of the civil penalty provision of 33 U.S.C. § 1344(s) sheds little light upon the subject. This provision, part of the Clean Water Act of 1977, was explained by the House Conference Committee simply as "provid[ing] similar enforcement authority with respect to permits issued by the Secretary under section 404 as is provided to the Administrator in section 309 of the Act [33 U.S.C. § 1319] with respect to permits issued under section 402 and 404 of the Act." H.R.Conf.Rep. No. 830, 95th Cong., 1st Sess., *reprinted* in 1977 U.S.Code Cong. & Ad.News 4326, 4478.

Section 1319 was part of the Federal Water Pollution Control Act Amendments of 1972. Because the civil penalty provision of that section is the same as that of § 1344, the legislative history of that provision should be indicative of the legislature's intent for the civil penalty. Unfortunately, neither the Senate Report nor Conference Report accompanying the amendments state an intent for the civil penalty provision. However, some insight into that intent can be gleaned from comments by individual legislators. Senator Bayh, one of the members of the Senate Conference Committee, stated during debate of the bill in the Senate that "the bill contains *substantial deterrents*, which should guarantee that ... provisions of this bill are complied with." 118 Cong.Rec. 33716 (1972) (emphasis added). Thus, it appears that the main thrust of the civil penalty is deterrence.

Additional support for this position is found in the House debates of H.R. 11896, a companion bill. The civil penalty provision of § 1319 was not part of the original Senate bill, but had its origin in H.R. 11896. *See* S.Conf.Rep. No. 1236, 92d Cong., 2d Sess., *reprinted* in 1972 U.S.Code Cong. & Ad.News 3668, 3809. During the House debate of that bill, Representative Madden stated that "[t]he emphatic provision of this legislation is that the Federal Enforcement Power will be enacted to prosecute violators of this legislation and compel compliance ..." 118 Cong.Rec. 10203 (1972). Representative Mizell stated that the House bill "[e]stablishes strict and severe penalties for violators, including the maximum civil penalty of $10,000 per day ..." 118 Cong.Rec. 10211 (1972). Although the Senate bill was enacted in lieu of H.R. 11896, references to the civil penal-

ty provision in that bill are persuasive since that provision was added to the Senate's bill. The statements of Representatives Madden and Mizell further support the position that the civil penalty provision of § 1319 was intended as a deterrent.

This position finds still further support in the EPA's Civil Penalty Policy. The current policy, issued in 1984, states that the "goals for penalty assessment in EPA administrative and judicial enforcement actions ... [are] deterrence, fair and equitable treatment of the regulated community, and swift resolution of environmental problems." Environmental Protection Agency Civil Penalty policy (February 16, 1984), Env't Rep. (BNA) 41:2991, 2991 (1984) (copy attached). This policy is certainly not evidence of the legislature's intent, but does represent EPA's interpretation of that intent. The agency's 1980 policy for violators of the Clean Air and Water Acts also puts the deterrence theme foremost, stating that "[t]he objective of this civil penalty policy is to assist in accomplishing the goals of environmental laws *by deterring violations and encouraging voluntary compliance.*" 1980 Policy, Env't Rep. (BNA) 41:1101, 1101 (emphasis added). The 1980 and 1984 policies clearly express the EPA's opinion that the civil penalty is a deterrent.

Although little evidence of legislative intent is available, it appears that the civil penalty in § 1319 was intended by Congress as a means to deter people from violating the Act. This conclusion is buttressed by the EPA's civil penalty policies, in which the EPA states that deterrence is a main objective in its determinations of what the penalty should be in any one particular case. Because the civil penalty is intended as a deterrent, it is penal in character. The civil penalty of § 1344 was patterned after that of § 1319 and thus is also penal in character. Accordingly, it does not survive Carter's death and cannot be assessed against his estate.

### III. CONCLUSIONS OF LAW

1. Defendants have violated the Clean Water Act, 33 U.S.C. §§ 1251–1376, and the Rivers and Harbors Act of 1899, 33 U.S.C. §§ 401–426i. *United States v. Joseph G. Moretti, Inc.,* 478 F.2d 418 (5th Cir.1973); *Avoyelles Sportsmen's League v. Alexander,* 473 F.Supp. 525 (W.D.La.1979); March 21, 1982, Report and Recommendation and March 15, 1983.

2. For violations of the Clean Water Act and the Rivers and Harbors Act of 1899, Section 309(b) of the Clean Water Act, 33 U.S.C. §§ 1319(b), and 33 U.S.C. § 406 grant federal courts the authority to enter permanent injunctive relief. Such injunctive relief should require the defendant to achieve compliance with the statutory scheme. *Weinburger v. Romero-Barcelo,* 456 U.S. 305, 102 S.Ct. 1798, 72 L.Ed.2d 91 (1982).

3. For wetlands violations, courts have repeatedly awarded total restoration of the wetlands especially in cases where the defendant has acted willfully. *United States v. Tull,* 615 F.Supp. 610 (E.D.Va.1983), *aff'd,* 769 F.2d 182 (4th Cir.1985).

4. The civil penalty of 33 U.S.C. § 1344(s)(5) does not survive the death of Joseph Carter.

5. Defendant Elizabeth Carter Edwards is ordered to complete the restoration plan described by the government in Exhibits 23 and 24, modified as follows:

I. Degrade all levee work done by Joseph Carter and anyone under his control since 1978. Specifically, all piles of spoil material are to be removed and any work done which resulted in an increase in height or width of the levee must be degraded to the level which existed prior to 1978. Mr. Tom Welborn shall designate the work required to restore the levee to its pre 1978 condition.

II. Ditches shown on Exhibit 24 must be filled in to the extent natural accumulations have not restored the ditches to their original elevation.

III. All wetlands shown on Exhibit 24 must be allowed to naturally revegetate.

IV. All restoration shall be complete by November 1, 1987.

V. Defendant shall allow access to authorized representatives of the U.S. Army Corps of Engineers and the U.S. Environmental Protection Agency to inspect restoration work and to point out areas where work is required.

VI. Upon completion of the restoration, defendant shall notify plaintiff, which shall have the right of final approval of restoration work.

VII. Plaintiff shall notify the Court upon completion of the restoration work.

IT IS SO ORDERED.