**UNITED STATES of America, Plaintiff,**

**v.**

**Judith L. LAMBERT, Individually and as Executrix of the Estate of Donald A. Lambert, deceased, Defendants.**

**Civil Action No. 2:94–1012.**

United States District Court,
S.D. West Virginia,
Charleston Division.

Jan. 31, 1996.

798

Rebecca A. Betts, U.S. Attorney, Carol Casto, Ass't. U.S. Attorney, Charleston, WV, Robert E. Lefevre, Daniel R. Dertke and Lois J. Schiffer, Environment & Natural Resources Div., Environmental Defense Section, Washington, DC, for plaintiff.

J. Randolph Query, Spradling & Query, Charleston, WV, for defendants.

## MEMORANDUM OPINION AND ORDER

HADEN, Chief Judge.

 Pending is the Plaintiff's Motion for Partial Summary Judgment on Liability. Defendants have not responded and the motion is ripe for determination.[1] Based upon the absence of a genuine issue of material fact and the law, the Court GRANTS the motion.

Under Rule 56(c) of the *Federal Rules of Civil Procedure,* summary judgment is proper only:

> "If the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to summary judgment as a matter of law."

Fed.R.Civ.P. 56(c). The moving party has the burden of initially showing the absence of a genuine issue concerning any material fact. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). Once the moving party has met its initial burden, the burden shifts to the nonmoving party to "establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). To discharge this burden, the nonmoving party cannot rely on its pleadings but instead must have evidence showing that there is a genuine issue for trial. *Id.* at 324, 106 S.Ct. at 2553. Furthermore, "[u]nsupported speculation is not sufficient to defeat a summary judgment motion." *Felty v. Graves–Hum-*

*phreys Co.,* 818 F.2d 1126, 1128 (4th Cir. 1987).

The undisputed facts are as follows. Donald A. Lambert and Judith L. Lambert jointly owned residential property bordering on the western bank of the Kanawha River ("the River") in Charleston, West Virginia. Because portions of the riverbank began eroding during the 1970's, the United States Army Corps of Engineers ("Corps") issued a General Permit to allow placement of fill material for protection of the riverbank. Work authorized to be done under the General Permit had to conform substantially to the existing shoreline configuration and could encroach into the River no further than five feet from the existing normal waterline.

On January 26, 1983 Mr. Lambert applied to the Corps under the General Permit for permission to place two hundred seventy-five (275) cubic yards of fill material at the River's edge to stabilize the riverbank and to prevent further erosion of the property. On February 1, 1983 the Corps authorized Mr. Lambert's request, subject to the conditions of the General Permit.

Mr. Lambert, an attorney, arranged for one of his clients, I.V. Cunningham, to perform the bank stabilization work by depositing fill material, consisting of concrete rubble, limestone riprap, and topsoil, on the riverbank. Mr. Lambert paid for this work by issuing Mr. Cunningham a twenty-five thousand five hundred dollar ($25,500.00) credit against Mr. Cunningham's accrued legal bills. Mr. Lambert also paid a second contractor, J. Wesley Carr, Incorporated, seven hundred forty-four dollars ($744.00) for nineteen (19) tons of limestone, and for renting a truck and a bulldozer.

---

1. Although the Defendants did not respond to the motion, the Court has an independent responsibility to determine whether judgment as a matter of law is warranted.

 "Although the failure of a party to respond to a summary judgment motion may leave uncontroverted those facts established by the motion, the moving party must still show that the uncontroverted facts entitle the party to 'a judgment as a matter of law.' The failure to respond to the motion does not automatically accomplish this. Thus, the court, in consider-

 ing a motion for summary judgment, must review the motion, even if unopposed, and determine from what it has before it whether the moving party is entitled to summary judgment as a matter of law. This duty of the court is restated in section (e) of the rule, providing, 'if the adverse party does not so respond, summary judgment, *if appropriate,* shall be entered against the adverse party.' Fed.R.Civ.P. 56(e) (emphasis added)."
 *Custer v. Pan American Life Ins. Co.,* 12 F.3d 410, 416 (4th Cir.1993).

Although Mr. Lambert had permission to place only two hundred seventy-five (275) cubic yards of fill material, he actually placed one thousand two hundred twenty-five (1,225) cubic yards. The material was placed both on the riverbank and in the River.

In 1985 Mr. Lambert constructed an eight (8) by fifty (50) foot boat dock, extending eight (8) feet from the fill into the River. Again the work was contracted through Cunningham and financed by a fourteen thousand five hundred seventy-five dollar ($14,-575.00) offset to Cunningham's accrued legal bills. In 1989 Mr. Lambert paid ShoreMaster, Incorporated, six thousand six hundred fifty dollars ($6,650.00) for three extensions, or "fingers," which were added to the dock to create two (2) boat slips. Each finger is four (4) feet wide, approximately twenty-three (23) feet long, and is angled sixty (60) degrees downstream. Mr. Lambert did not apply for authorization to install either the dock or the fingers.

The Corps first became aware of the unauthorized fill and dock in August 1989 when a neighbor of the defendant complained the fill had encroached on his property. A Corps official investigated the site on August 16, 1989. On September 29, 1989, the Corps informed Mr. Lambert the fill extended further into the River than his General Permit allowed and the boat dock lacked proper authorization. In response, Mr. Lambert applied for an "after the fact" permit [2] on November 3, 1989.

Mr. Lambert admitted in the after the fact permit application he deposited a total of approximately one thousand two hundred twenty-five (1,225) cubic yards of material, as opposed to the two hundred seventy-five (275) cubic yards authorized by the General Permit. Mr. Lambert estimated approximately seventy-three and one half percent (73.5%) of the fill material was deposited below the ordinary high water mark.[3] The fill extends approximately ninety-two and one half (92.5) feet along the riverbank, and approximately thirty (30) feet into the River. Mr. Lambert also admitted in the application he did not have a permit for either the dock or the fingers.

The United States Department of the Interior Fish and Wildlife Service ("FWS"), Environmental Protection Agency ("EPA") Region III, and the West Virginia Department of Natural Resources ("WVDNR") each objected to issuance of an after the fact permit. FWS noted the fill resulted in the loss of approximately one thousand five hundred (1500) square feet of valuable nearshore shallow water habitat. FWS concluded the need to stabilize the riverbank did not justify the extent of the fill. FWS recommended the permit for the fill portion of the work be denied, the fill be removed, and the shoreline be stabilized. FWS further stated it did not object to the issuance of a permit for the boat dock or the riprap.

EPA Region III agreed the project had resulted in the loss of a portion of the shallow water habitat for aquatic fauna and flora. The EPA further stated:

"the fill has created an obstruction in the river, disrupting normal flow and circulation patterns and subsequently increasing erosion and sedimentation. Such could be a significant factor in the erosion taking place along the unprotected existing bank immediately upstream from the fill area.

This approximately 40–foot by 90–foot level fill goes far beyond that which is necessary to provide the applicant's stated purpose of bank protection and shoreline stabilization. Rather, creating a relatively level grassed area for recreational use was evidently an additional project purpose ... The bank protection, shoreline stabilization, and boat dock placement can all be accomplished without need for the adjacent

---

**2.** Under Section 404, there are two types of permits. General permits authorize different types of discharges on a regional or national basis. *See* 33 C.F.R. § 323.2(h). Individual permits are issued for specific discharges only. *See* 33 C.F.R. § 323.2(g). In limited circumstances, individual permits may be issued after the filling has occurred. These are known as "after the fact" permits.

**3.** The ordinary high water mark on non-tidal rivers "is the line on the shore established by the fluctuations of water." 33 C.F.R. § 329.11(a)(1).

level fastland." [4]

(Letter from Greene A. Jones, Director, Environmental Services Division, to Colonel Thomas E. Farewell, District Engineer, 1/22/90 at 2). The EPA recommended the permit be denied, the fill placed for the creation of fastland be removed, the area restored to its original contours, and the riprap for bank protection and shore stabilization be brought back in line with the existing adjacent shoreline. Regarding the boat dock, the EPA only recommended Mr. Lambert be required to provide the existing dimensions of the structure and an explanation for a need for two boat slips.

Similarly, the WVDNR expressed concern about the gradual loss of critical wildlife habitat.[5] The WVDNR recommended the permit be denied and the riverbank be restored to its original contours. The WVDNR also denied the State Certification required under Section 401 of the CWA for the issuance of a permit. See 33 U.S.C. § 1341.

In addition, the adjacent upstream and downstream neighbors of the Lamberts objected to a permit for the fill material.

As a result, on June 11, 1990 the Corps denied Mr. Lambert's after the fact permit application and directed him to remove excess fill and riprap beyond that necessary to achieve bank stabilization no later than August 1, 1990. The Corps advised Mr. Lambert the boat dock could remain but must be moved thirty (30) feet closer to the shoreline to conform to the new alignment of the riverbank after the completion of the corrective

work. To date, no action has been taken to remove the excess fill and riprap. Donald A. Lambert died on April 8, 1995.

■ The United States, on behalf of the EPA, initiated this action against Donald and Judith Lambert. Subsequent to Mr. Lambert's death, the Court granted Plaintiff's motion to substitute Judith L. Lambert, as Executrix of the Estate of Donald A. Lambert, as a party defendant in this action. Count I of the two-count Complaint seeks injunctive relief and civil penalties for violations of Section 301 of the Clean Water Act ("CWA"), 33 U.S.C. § 1311 (1994). Count II seeks injunctive relief under Sections 10 and 13 of the Rivers and Harbors Act ("RHA"), 33 U.S.C. §§ 403 and 407 (1899). This motion seeks partial summary judgment on liability on both Counts as to Judith L. Lambert as Executrix of the Estate of her husband.[6] The remaining allegations against Judith L. Lambert *individually* are not a part of Plaintiff's motion or governed by the decision rendered in this Memorandum Opinion and Order.

## I.

### THE CLEAN WATER ACT

■ The CWA is a comprehensive statute designed to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). The cornerstone of the CWA regulatory program is Section 301(a), 33 U.S.C. § 1311(a), which prohibits the discharge of any pollutant[7]

---

**4.** "Fastland" is the land above the ordinary high water mark. *United States v. Kansas City Life Ins. Co.,* 339 U.S. 799, 805, 70 S.Ct. 885, 888–89, 94 L.Ed. 1277 (1950); *Miller v. United States,* 583 F.2d 857, 862 (6th Cir.1978); *see also United Texas Transmission Co. v. United States Army Corps of Engineers,* 7 F.3d 436, 440 (5th Cir. 1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 2738, 129 L.Ed.2d 859 (1994) (fastland is the land outside the original stream banks).

**5.** The shallow water area along the riverbank is also valuable for sport fishing. The River is listed as a High Quality Stream and is stocked by the WVDNR with muskellunge and hybrid striped bass for this purpose.

**6.** A cause of action for violations of the CWA and RHA, to the extent injunctive relief is sought, survives the death of the violator and may be

maintained against the violator's estate. *See United States v. Edwards,* 667 F.Supp. 1204, 1206, 1215 (W.D.Tenn.1987). Civil penalties, however, do not survive the death of the violator. *Id.* Therefore, summary judgment as to the Estate's liability is appropriate.

**7.** A "pollutant" is broadly defined to include "dredged soil, ... garbage, ... discarded equipment, rock, sand, [and] cellar dirt...." 33 U.S.C. § 1362(6); *see also United States v. Schallom,* 998 F.2d 196, 198 (4th Cir.), *cert. denied,* —— U.S. ——, 114 S.Ct. 277, 126 L.Ed.2d 228 (1993) (approving instruction defining pollutant as "any solid waste or chemical waste ... discharged into the waters of the United States. In this context, cement and shotcrete [combination of sand and cement] are pollutants within the meaning of this definition"); *Minnehaha*

from a point source [8] into navigable waters [9], except in accordance with restrictions established under, *inter alia*, Section 404 of the CWA, 33 U.S.C. § 1344. Section 404 authorizes the Secretary of the Army, acting through the Chief of Engineers, to "issue permits ... for the discharge of dredged or fill material [10] into the navigable waters...." 33 U.S.C. § 1344(a). Accordingly, the discharge of dredged or fill material into navigable waters without a Section 404 permit violates Section 301(a) of the CWA, 33 U.S.C. § 1311(a). *See United States v. Huebner*, 752 F.2d 1235, 1239 (7th Cir.), *cert. denied*, 474 U.S. 817, 106 S.Ct. 62, 88 L.Ed.2d 50 (1985).

■ The CWA imposes liability both on the party who actually performed the work and on the party with responsibility for or control over performance of the work. *See United States v. Board of Trustees of Fla. Keys Community College*, 531 F.Supp. 267, 274 (S.D.Fla.1981). Further, the CWA imposes strict liability. The "no discharge" prohibition of Section 301 was "written without regard to intentionality ... making the person responsible for the discharge of any pollutant strictly liable." *United States v. Earth Sciences, Inc.*, 599 F.2d 368, 374 (10th Cir.1979); *accord Sierra Club v. Abston Constr. Co.*, 620 F.2d 41, 46 (5th Cir.1980).

■ To establish a *prima facie* case, the United States must show the alleged violator: 1) discharged dredged or fill material; 2) from a point source; 3) into the waters of the United States; 4) without a permit issued under Section 404 of the CWA. *See United States v. Schallom*, 998 F.2d 196, 198 (4th Cir.), *cert. denied*, —— U.S. ——, 114 S.Ct. 277, 126 L.Ed.2d 228 (1993); *Avoyelles Sportsmen's League, Inc. v. Marsh*, 715 F.2d 897, 922 (5th Cir.1983). Here, there is no question the United States has established a *prima facie* case against Mr. Lambert's Estate.

■ First, Mr. Lambert discharged fill material. Mr. Lambert admitted he deposited broken concrete, stone, and soil into the River. Defendant's only stated defense is that an independent contractor actually performed the work and discharged the fill material.

As previously discussed, this is no defense to liability under the CWA. Although Mr. Lambert did not place the fill material on the riverbank and in the River personally, he clearly was responsible for the performance of that work. The Lamberts owned the property on which the work was done. Mr. Lambert paid for the raw materials and necessary equipment and paid the contractor a substantial sum to perform the task. This work could not have been accomplished with-

---

*Creek Watershed District v. Hoffman*, 597 F.2d 617, 625 (8th Cir.1979) (discussing broad definition of term "pollutant"). "Discharge of a pollutant" is defined as "any addition of any pollutant to navigable waters from any point source...." 33 U.S.C. § 1362(12).

8. A "point source" is any "discernible, confined and discrete conveyance...." 33 U.S.C. § 1362(14). The concept of a point source embraces "the broadest possible definition of any identifiable conveyance from which pollutants might enter waters of the United States." *United States v. Earth Sciences, Inc.*, 599 F.2d 368, 373 (10th Cir.1979). As such, bulldozers, backhoes, draglines, and other earthmoving equipment are all point sources under the CWA. *United States v. Huebner*, 752 F.2d 1235, 1243 (7th Cir.), *cert. denied*, 474 U.S. 817, 106 S.Ct. 62, 88 L.Ed.2d 50 (1985); *Avoyelles Sportsmen's League, Inc. v. Marsh*, 715 F.2d 897, 922–23 (5th Cir.1983); *United States v. Sinclair Oil Co.*, 767 F.Supp. 200, 204 (D.Mont.1990); *United States v. Tull*, 615 F.Supp. 610, 622 (E.D.Va.1983), *aff'd*, 769

F.2d 182 (4th Cir.1985), *rev'd on other grounds & remanded*, 481 U.S. 412, 107 S.Ct. 1831, 95 L.Ed.2d 365 (1987); *United States v. Weisman*, 489 F.Supp. 1331, 1337 (M.D.Fla.1980).

9. "Navigable waters" are broadly defined to encompass all "waters of the United States...." 33 U.S.C. § 1362(7). Thus, under the CWA the definition of "navigable waters" is not limited to waters which are navigable in fact. *See* 118 Cong.Rec. 33,699 (1972); *Huebner*, 752 F.2d at 1239; *United States v. Byrd*, 609 F.2d 1204, 1209 (7th Cir.1979).

10. "Fill material" is defined as "any material used for the primary purpose of replacing an aquatic area with dry land or changing the bottom elevation of an [sic] waterbody." 33 C.F.R. § 323.2(e). "Discharge of fill material" means any "addition of fill material into waters of the United States. The term generally includes ... property protection and/or reclamation devices such as riprap...." 33 C.F.R. § 323.2(e), (f).

out Mr. Lambert's express approval.[11] Furthermore, whether Mr. Lambert *intended* to violate the Act by his actions is immaterial because the Act imposes strict liability.

Second, the fill material was discharged from a point source. Cranes were used to discharge the broken concrete, rock, and soil. Earthmoving equipment qualifies as a point source. *See Avoyelles,* 715 F.2d at 923; *Sinclair Oil,* 767 F.Supp. at 205.

Third, the Kanawha River is a water of the United States. *See* 33 U.S.C. § 1362(7); 33 C.F.R. § 328.3; 40 C.F.R. § 230.3(s); Public Notice of General Permit No. 80–150, 11/3/80, at App. A (defining Kanawha River from its mouth to Mile 92[12] as a navigable water of the United States).

Fourth, Mr. Lambert lacked a permit for the majority of his filling activity. Mr. Lambert had authorization to deposit two hundred seventy-five (275) cubic yards of fill for riverbank stabilization. However, as Mr. Lambert admitted in his after the fact permit application, one thousand two hundred twenty-five (1,225) cubic yards were actually deposited, over four times the authorized amount. To the extent more than two hundred seventy-five (275) cubic yards of fill were placed on the site, the fill exceeded any authorization.

The Court concludes the United States has met each element of its *prima facie* case and is entitled to summary judgment on Count I. The Court concludes the Estate of Donald A. Lambert is liable for violations of Section 301 of the CWA.

## II.

### THE RIVERS AND HARBORS ACT

Count II of the Complaint alleges Mr. Lambert violated Section 10 of the RHA when he placed a boat dock in the River without first obtaining a permit. Count II also alleges Mr. Lambert violated Section 13 of the RHA when he placed refuse in the River.

The RHA was enacted to preserve and protect the navigable waterways of the United States. *United States v. Pennsylvania Indus. Chem. Corp.,* 411 U.S. 655, 663, 93 S.Ct. 1804, 1811, 36 L.Ed.2d 567 (1973). The cornerstone of the RHA is Section 10, which prohibits the obstruction of navigable waters.[13] 33 U.S.C. § 403. This is accomplished through three distinct clauses.

█ The first clause places a flat prohibition on the "creation of any obstruction ... to the navigable capacity of any of the waters of the United States." 33 U.S.C. § 403. The term "obstruction" is broadly interpreted, and the "threshold for a finding of obstruction is quite low." *United States v. Oak Beach Inn Corp.,* 744 F.Supp. 439, 445 (S.D.N.Y.1990); *United States v. Republic Steel Corp.,* 362 U.S. 482, 489, 80 S.Ct. 884, 888–89, 4 L.Ed.2d 903 (1960).

The second clause prohibits the building of any structure, such as a wharf, pier, or jetty in any navigable river outside of established harbor lines, absent specific authorization by the Corps. 33 U.S.C. § 403. The Corps' regulations define "structure" to include boat docks. *See* 33 C.F.R. § 322.2(b).

The third clause of Section 10 makes it unlawful to "excavate or fill, or in any manner to alter or modify the course, location, condition, or capacity" of any port, harbor, lake, or channel of any navigable water of the United States without authorization from the Corps. 33 U.S.C. § 403.

█ Section 13 of the RHA makes it unlawful to "discharge, or deposit, or cause ... to be ... discharged or deposited ...

---

**11.** In fact, Mr. Lambert admitted exceeding the authorization given him for the deposit of fill material. In the expense and billing summary for I.V. Cunningham, Mr. Lambert stated seven hundred seventy-five (775) cubic yards of fill material was used on the project.

**12.** The Lamberts' property is located at or near Mile 60.2 and Mile 60.4.

**13.** The RHA does not define the term "navigable waters." However, the Corps has issued regulations narrowly defining navigable waters of the United States for purposes of the RHA as:

"those waters that are subject to the ebb and flow of the tide and/or are presently used, or have been used in the past, or may be susceptible for use to transport interstate or foreign commerce."

33 C.F.R. § 329.4.

any refuse matter of any kind or description whatever ... into any navigable water of the United States" without a permit. 33 U.S.C. § 407. The term "any refuse matter of any kind" is all encompassing and applies to virtually any foreign material placed into navigable waters. *United States v. Standard Oil Co.*, 384 U.S. 224, 226–230, 86 S.Ct. 1427, 1428–1430, 16 L.Ed.2d 492 (1966) ("the word 'refuse' includes all foreign substances and pollutants apart from those 'flowing from streets and sewers and passing therefrom in a liquid state' into the watercourse.") [14]; *Reserve Mining Co. v. Environmental Protection Agency*, 514 F.2d 492, 530 (8th Cir.1975) (any foreign materials constitute refuse matter under Section 13); *United States v. Kennebec Log Driving Co.*, 491 F.2d 562 (1st Cir.1973), *cert. denied*, 417 U.S. 910, 94 S.Ct. 2607, 41 L.Ed.2d 214 (1974) (peeled bark and sunken logs on river bottom were refuse matter under Section 13); *United States v. United States Steel Corp.*, 482 F.2d 439, 442–447 (7th Cir.1973), *cert. denied*, 414 U.S. 909, 94 S.Ct. 229, 38 L.Ed.2d 147 (1973) (red-brown particulate sediment was refuse matter under Section 13). In addition, Section 13 prohibits the deposit of material on the bank of any navigable water if such material is liable to be washed into the navigable water by storms, floods or otherwise, where-by navigation may be impeded. 33 U.S.C. § 407.

 The deposit of refuse matter into navigable waters is prohibited without regard to whether such deposits affect or impede navigation. *United States v. Pennsylvania Indus. Chem. Corp.*, 411 U.S. 655, 670–72, 93 S.Ct. 1804, 1814–1816, 36 L.Ed.2d 567 (1973) ("section 13 is to be read in accordance with its plain language as imposing a flat ban on the unauthorized deposit of foreign substances into navigable waters, regardless of the effect on navigation"); *United States Steel Corp.*, 482 F.2d at 443–447 (same); *Reserve Mining*, 514 F.2d at 530 (same); *United States v. Valley Camp Coal Co.*, 480 F.2d 616, 617 (4th Cir.1973) (flat ban on unauthorized deposit of foreign substances in or on tributaries of navigable rivers).

 Mr. Lambert admitted he paid for installation of a boat dock and three dock extensions without a permit. The dock and its extensions are "structures" that obstruct the navigable capacity of the River. The River's normal flow and circulation patterns have been disrupted also. Mr. Lambert's actions in constructing the dock and extensions without a permit violated of Section 10 of the RHA.[15]

14. The Court examined the predecessor statutes to Section 13 and found the phrase "any refuse matter of any kind or description" must be construed *in pari materia* with the lists of substances found in the earlier Acts. *Standard Oil*, 384 U.S. at 228, 86 S.Ct. at 1429.
 "An 1886 Act ... made it unlawful to empty 'any ballast, stone, slate, gravel, earth, slack, rubbish, wreck, filth, slabs, edgings, sawdust, slag, or cinders, or other refuse or mill-waste of any kind.... An 1888 Act ... banned the discharge of 'refuse, dirt, ashes, cinders, mud, sand, dredgings, sludge, acid, or any other matter of any kind, other than that flowing from streets, sewers, and passing therefrom in a liquid state'.... The 1890 Act ... made unlawful emptying into navigable waters 'any ballast, stone, slate, gravel, earth, rubbish, wreck, filth, slabs, edgings, sawdust, slag, cinders, ashes, refuse, or other waste of any kind'.... The 1894 Act ... prohibited deposits ... of 'ballast, refuse, dirt, ashes, cinders, mud, sand, dredgings, sludge, acid, or any other matter of any kind other than that flowing from streets, sewers, and passing therefrom in a liquid state.' "
 384 U.S. at 226–27, 86 S.Ct. at 1428–1429. The Court further stated the 1899 Act "was no more than an attempt to consolidate these prior Acts into one." *Id.* at 227, 86 S.Ct. at 1429.

15. The Court is mystified by Plaintiff's Prayer for Relief which prays the Court order the removal of "all obstructions and structures placed by the Defendant in the Kanawha River." (Complaint at 6). In Plaintiff's Memorandum, Plaintiff also remarks the Defendants have taken no action to remove the dock. (Plaintiff's Mem. at 11). While it is clear the dock and its extensions were built without a permit and in violation of the statute, the Defendants were never asked to remove the dock. No objections to the structure were lodged with the Corps. Furthermore, the Corps' denial of Mr. Lambert's after the fact permit application specifically stated the "recreational boat dock may remain." (Letter from Colonel Thomas E. Farewell to Donald A. Lambert, 6/11/90, at 2). The Corps, however, did require Mr. Lambert to move the dock thirty (30) feet closer to shore to conform with the new alignment of the riverbank after the completion of the corrective work. *Id.* Under the circumstances, the Court concludes removal of the boat dock and extensions is unnecessary.

Mr. Lambert also placed foreign material consisting of broken concrete, stone, and soil on the riverbank. This material qualifies as refuse under RHA Section 13. Moreover, this refuse was placed both on the riverbank and directly in the River. Because the refuse was placed below the River's ordinary high water mark, at times virtually the entire fill is underwater. Clearly, Mr. Lambert's actions violated of Section 13 of the RHA.

The Court concludes Mr. Lambert violated Section 301 of the CWA and Sections 10 and 13 of the RHA. Because Mr. Lambert is now deceased, his Estate bears responsibility to remediate these violations. Accordingly, the Court GRANTS Plaintiff's Motion for Partial Summary Judgment on Liability on Counts I and II to the extent detailed below.

The Estate is enjoined permanently from further discharges of refuse at the site, except as may be authorized pursuant to a Department of the Army permit. Pursuant to the directive given to Mr. Lambert by the Corps (see Letter from Colonel Thomas E. Farewell to Donald A. Lambert, 6/11/90), the Court further ORDERS:

1. The Estate is to remove all excess fill & riprap beyond that necessary to achieve bank protection. The fill to be removed is the level area ninety-two and one half (92.5) feet in length and extending approximately thirty (30) feet riverward of the toe of the slope of the riverbank;

2. The Estate is to provide Corps approved transitions so that the riverbank conforms to the adjacent riverbank upstream and bank protection projects downstream from the Lamberts' property;

3. The boat dock and extensions must be moved thirty (30) feet nearer to the shoreline to conform to the new alignment of the bank after the corrective work has been completed;

4. The corrective measures must be completed no later than July 15, 1996;

5. The Estate is to furnish the Corps' Operations and Readiness Division Regulatory Functions Branch with a copy of the plans for the corrective work forthwith, but in no event later than thirty (30) days after the entry of this Memorandum Opinion and Order;

6. The Estate is to notify Mr. James M. Richmond of the Corps' Operations and Readiness Division Regulatory Functions Branch two weeks in advance of commencement of the restoration to arrange an on-site meeting to ensure the requirements of the restoration are fully understood.

The Clerk is directed to send a copy of this Memorandum Opinion and Order to counsel of record.